WAHLER, ET AL. *v.* MONTGOMERY COUNTY COUNCIL, ET AL.

[No. 78, September Term, 1967.]

*Decided February 19, 1968.*

*Motion for rehearing filed on March 4, 1968; denied on March 4, 1968.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN and SINGLEY, JJ.

*Howard J. Thomas,* with whom were *Bradshaw, Thomas & Yeatman* on the brief, for appellants.

*C. Edward Nicholson* for Artery Construction Company, Inc., one of appellees.

No brief filed for Montgomery County Council, other appellee.

McWILLIAMS, J., delivered the opinion of the Court. BARNES, J., dissented and filed a dissenting opinion; see page 71, *infra.*

The folks on Jingle Lane opposed this Montgomery County rezoning. The appellee (Council) decided against them. The trial judge upheld the action of the Council. This is their appeal.

The property in question (the Artery tract [1]) is rectangular in shape (200'± x 1130') and it contains (in 2 parcels) about 5 acres. It is in a neighborhood, known as Glenmont, about 5 miles north of the north corner of the District of Columbia. It fronts (190') on the northeast side of, and runs perpendicular to, Georgia Avenue, a heavily traveled main thoroughfare. The zoning, before the Council changed it to R-20 (multiple family, medium density residential), was R-60 (one family, detached residential, 6000 sq. ft. min.). Some single family residences have been built on it. Abutting, on the southeast, is the R-30

---

1. Artery Construction Co., Inc., is the contract purchaser of the land in question and the applicant for the rezoning.

(multiple family, low density residential) tract which was before us in *Marcus v. Montgomery County,* 235 Md. 535, 201 A. 2d 777 (1964). A 70 foot road, designated P-9 (not yet built), has been relocated so that instead of running through the middle of the *Marcus* tract it will run along and provide access to (from Georgia Avenue) the southeast side of the Artery tract. Abutting to the northeast is a tract which had been zoned R-20 when the Council, on 1 March 1965, heard the instant case. On 14 January 1966, however, we decided *Baker v. Montgomery County,* 241 Md. 178, 215 A. 2d 831 (1966), which nullified the R-20 zoning. Therefore, when the Council decided the instant case, on 15 February 1966, the *Baker* tract had reverted to its original classification, R-90 (same as R-60 except for 9000 sq. ft. min.).

The land to the northwest is zoned R-90 except for 4.2 acres lying between the Artery tract and the lots fronting on Jingle Lane. This 4.2 acre tract was rezoned from R-90 to R-T (Town Houses) later in the afternoon of the same day, 15 February 1966, the Artery tract was rezoned. Between the Artery tract and the 4.2 acre tract is a church lot containing about 3 acres. The houses on Jingle Lane are about 600' northwest of the Artery tract.[2]

The land to the northeast (*Baker* tract) is undeveloped and partially wooded. To the north and northwest there are a number of large, well-maintained, single family residences fronting on Jingle Lane and Weller Road. Across Georgia Avenue, to the west, there is some vacant land beyond which there are some single family residences. On the west side of Georgia Avenue, opposite the Artery tract, there are 2 parcels (each containing about 2 acres) zoned R-T. To the east, in the *Marcus* tract, some apartments were under construction at the time of the hearing in March 1965.

The technical staff, although noting that the requested reclassification was not "in conformance with the Master Plan for the Upper Northwest Branch Watershed, Part 1, Zoning and Highways, adopted April 26, 1961," concluded that the

---

**2.** Appellee in its brief concedes that the appellants have standing to pursue this appeal.

Artery tract was "in effect surrounded by land which is zoned for multi-family use" and it recommended approval of the re· quest for R-20 zoning. The Planning Board approved the recommendation of the technical staff and recommended to the Council that it be rezoned to R-20.

As has been said, the hearing before the Council was held on 1 March 1965. Two weeks short of a year later, 15 February 1966, the Council filed its opinion and resolution granting the R-20 rezoning. The only reasons stated in the opinion in support of its action are as follows:

> "The District Council agrees with the recommendations of the Technical Staff and the Planning Board. These properties are abutting land to the southeast which is zoned for multi-family use and are located directly across Georgia Avenue from a town house development. The difficulties of access to the subject properties and liabilities of fragmented ownership described in the Staff report are additional reasons for granting these applications.
>
> "For these reasons and because to aid in the accomplishment of a coordinated, comprehensive, adjusted and systematic development of the Maryland-Washington Regional District * * *."

The trial judge found "from the record * * * that the issue of substantial change * * * [was] fairly debatable." He was of the opinion that "the record of the hearing before the Council disclose[d] ample evidence of a change in the character of the neighborhood since the original zoning." He observed also that these changes were "recognized by both the Technical Staff and the Planning Commission." The court's opinion does not specify any instances of the "ample evidence" of change.

We shall undertake a dissection of the Council's opinion to see if it will lead to the discovery of any evidence which might make the issue of substantial change fairly debatable.

(i)

*The Council agrees with the recommendations of the technical staff and the Planning Board.*

The staff, in addition to what we have already noted, said

the Artery tract was "bounded to the northeast by the R-20 [*Baker* tract] zone." As has been said, this zoning reverted to R-90 on 14 January 1966, a month before the Council's resolution. The staff alluded to some "difficulties of access" to the Artery tract from Georgia Avenue but how this would have been alleviated by the rezoning was not explained. Oddly enough, the staff seems to have overlooked the fact that the proposed relocation and realignment of the 70 foot road (P-9) probably would have solved whatever "difficulties of access" there might have been. There is no doubt the staff was aware of this proposal because about 0.7 of an acre was withheld from the recommended rezoning for the "area required for [the] right of way (if the proposed amendment is adopted)." The realignment and relocation were approved by the Planning Commission on 10 March 1965, 11 months before the Council's resolution. Since the Planning Board did nothing more than approve the staff's recommendation "as generally stating the Board's opinion" it seems clear to us that the recommendations of the Board and its staff had lost whatever validity they may have had when the Council passed its resolution on 15 February 1966.

(ii)

*Abutting land to the southeast zoned for multi-family use.*

The Council either forgot or chose to ignore the principal reason it gave for changing this 27 acre tract (*Marcus* tract) from R-90 to R-30. It said, in its opinion, (in *Marcus*) that the reclassification (of the *Marcus* tract) "would be most logical in view of the existing and planned highway pattern and the fact that the *R-30 zone,* as now constituted in the Ordinance, *provides a nice transition between commercial and R-90 zoning.*" (Emphasis supplied.) The "R-90 zoning," of course, refers to the *Baker* tract (and beyond) to the northeast and, very likely, to the Artery tract (and beyond) to the northwest. The Artery tract, of course, was R-60.

In *Baker,* we said that the rezoning of abutting property does not always warrant the rezoning of adjacent property. And we said also, in *Baker,* that "we have recognized the fact that apartment zoning may constitute a buffer between commercial and

residential zones." *Id.* at 185. Moreover, in respect of this very tract (the *Marcus* tract), Judge Horney, for the Court, in *Baker,* said:

"* * * Although a buffer zone was not mentioned by this Court as a reason for affirming the action of the council in *Marcus v. Montgomery County Council, supra, on which the council erroneously relied* in the instant case to justify the rezoning of the subject property, *the apartment zoning approved in that case was nevertheless a buffer between commercial and residential zones." Id.* at 186. (Emphasis supplied.)

It would seem to follow that if the Council, in *Baker,* "erroneously relied" on the rezoning of the *Marcus* tract to R-30, then that same reliance in the instant case is likewise erroneous.

(iii)

*Located directly across Georgia Avenue from a*
*town house development.*

In *Knudsen v. Montgomery County,* 241 Md. 436, 217 A. 2d 97 (1966), we held that the R-T zone, like the R-H zone, *Beall v. Montgomery County,* 240 Md. 77, 212 A. 2d 751 (1965), is a "Non-Euclidian" or floating zone. Accord and harmony with the surrounding zoning are essential to its validity. Since this compatibility with the balance of the neighborhood must exist it can hardly be said that the granting of such a rezoning is evidence of a substantial change in the character of the neighborhood. Indeed it would seem that any R-T rezoning, in which compatibility has been determined, would operate to increase the stability of the neighborhood and add permanence to its character. While it is true that the Council, in its resolution creating the R-T zone opposite the Artery tract, made no mention of compatibility, finding, instead, that there had "been a sufficient change in the character of the neighborhood to warrant the classification," we cannot say that the R-T rezoning was not, in fact, compatible with the surrounding R-60 and R-90 zoning. The recommendations of the technical staff and the Planning Board, in that case, are not in this record and, since their procedures are not in issue here, we

shall assume they considered the matter of compatibility and found it to exist. Perhaps attention should be drawn to the fact that the Council's resolution (in the R-T matter) was dated 1 December 1964, 7 months before we decided *Beall, supra*. In this context what we said in *Bujno v. Montgomery Co. Coun.*, 243 Md. 110, 220 A. 2d 126 (June 1966) takes on added significance. As Judge Barnes, for the Court, put it:

> "The appellants also seek to distinguish *Beall* from the case at bar on the ground that in *Beall* the Technical Staff, the Planning Board and the Council all indicated that the application complied with the purposes of the R-H zone whereas in the case at bar, the Technical Staff and Planning Board did not indicate this and the Council sought to justify its action by a finding that there had been sufficient change in the character of the neighborhood. We point out that the order of the Council in the case at bar was filed on December 18, 1964, several months *before* our decision in *Beall* which was decided on August 27, 1965, so that the Council did not have the benefit of the *Beall* opinion in which we indicated there should be a finding that the proposal for R-H zoning complied with the purposes of that zone. Although it is most desirable that the Council should find specifically that the proposal does comply with the R-H zone purposes, this finding may be inferred from the Council's opinion even though, as a matter of abundant caution perhaps, it also found that there had been a sufficient change of conditions in the neighborhood to justify the proposed reclassification." *Id*. at 118-19.

It cannot be said, of course, that the creation of the R-T zone did not effect some change. Whatever change did take place, however, must be assumed, absent persuasive evidence to the contrary, to have been compatible with the residential character of the neighborhood. We do not think it can be considered as evidence which would make the issue of substantial change in the character of the neighborhood fairly debatable.

### (iv)

### *Difficulties of access.*

In addition to what has already been said in this regard it should be noted that besides fronting 190 feet on Georgia Avenue access was provided by a 15 foot right of way running northwest from Georgia Avenue through the adjoining property and along the northwestern boundary of the Artery tract. Even assuming access was difficult, that problem had already been solved by the realignment of the proposed 70 foot road (P-9) along the southeastern boundary. This had been accomplished before the adoption of the resolution by the Council. We see nothing here which has any evidentiary value.

### (v)

### *Liabilities of fragmented ownership.*

The conclusion of the technical staff was that:

> "The fragmented pattern of ownership and the fact that a number of the properties have narrow frontage and access to the interior is by means of Ara Drive [the 15 foot right of way] which is extremely narrow and not dedicated to public use, makes additional single family development in the area difficult if not impossible."

As paraphrased by the Council it becomes the "liabilities of fragmented ownership described in the Staff report." What the staff meant by its choice of language is hard to say. What the Council meant by its paraphrase is a bit more of a problem. How it becomes evidence of a substantial change in the character of the neighborhood is utterly beyond our ken.

The Council, it will be recalled, did not make a specific finding of original mistake nor change in the character of the neighborhood. Nor did the Planning Board; nor did the technical staff. The first mention of "substantial change in the character of the neighborhood" appears in the opinion of the trial judge. We have examined the record with care but we have been unable to find any evidence, in support of the action of the Council, which had any validity, force or effect on 15 February 1965, when its resolution was adopted.

In *Baker,* Judge Horney, for the Court, repeated what has been said on other occasions:

> "While it has been uniformly held that the court, in reviewing the action of zoning authorities, will not substitute its judgment for that of the zoning officials, *Marcus v. Montgomery County Council, supra,* at p. 541 (of 235 Md.), *Pallace v. Inter City Land Co.,* 239 Md. 549, 212 A. 2d 262 (1965), a court will, where the record is so devoid of substantial supporting facts as to be incapable of raising a debatable issue, declare the legislative or administrative action invalid. *Levitt and Sons v. Board of County Commissioners,* 233 Md. 186, 195 A. 2d 723 (1963); *Jobar Corp. v. Rodgers Forge,* 236 Md. 106, 202 A. 2d 612 (1965)." *Id.* at 186.

Other questions were presented but in light of what has been said our consideration of them is not required. We think the trial judge should have reversed the action of the Council.

> *Order reversed.*
> *Costs to be paid by the appellee,*
> *Artery Construction Company,*
> *Inc.*

BARNES, J., dissenting:

I dissent because, in my opinion, there was sufficient evidence of a change of conditions in the neighborhood to justify the decision of the Council to grant the change of zone from R-90 to R-20 for the subject property.

The granting by the Council on December 1, 1964, of the rezoning of 3.81 acres of land directly across the street from the subject property from R-60 to R-T, to permit the erection of town houses, is, in itself, sufficient evidence of a change in conditions in the neighborhood to justify *the Council's* granting the R-20 rezoning in the present case. We have held that a change in zone increasing the density of residential use may result in a substantial change in the character of the neighbor-

hood. *Bosley v. Hospital for Consumptives of Maryland,* 246 Md. 197, 204, 227 A. 2d 746, 750 (1967).

The majority, in part iii of its opinion, holds that the granting of the R-T zone opposite the instant tract is not sufficient change to justify the Council's action, but it is not clear on what grounds the majority relies. At one point, after noting that the R-T zone is a floating zone and that compatibility is a requirement, the majority states:

> "Since this compatibility with the balance of the neighborhood must exist it can hardly be said that the granting of such a rezoning is evidence of a change in the character of the neighborhood. Indeed it would seem that any R-T rezoning, in which compatibility has been determined, would operate to increase the stability of the neighborhood and add permanence to its character."

Further on in the same paragraph, however, the Court says:

> "It cannot be said, of course, that the creation of the R-T zone did not effect some change. Whatever change did take place, however, must be assumed, absent persuasive evidence to the contrary, to have been compatible with the residential character of the neighborhood."

In my opinion, the majority is in error whether it is holding that, as a matter of law, the granting of a floating zone *cannot be* a "change in the neighborhood" or, that the granting of a floating zone *can* be a change, but must be *presumed not to be* in the absence of persuasive evidence to the contrary.

Section 111-12, R-T zone, town houses, of the Montgomery County Zoning Ordinances provides, in part, as follows:

> "Purpose—The purpose of the R-T Zone is to provide suitable sites for Town Houses, that will more fully and efficiently utilize available public utilities and services, and so as to prevent undue congestion in sections of the County where such facilities are not available or cannot be conveniently and economically pro-

vided. It is the purpose of the R-T Zone to provide the maximum possible amount of freedom in the design of Town Houses and their grouping and layout within the areas classified in that zone; to provide the amenities normally associated with less dense zoning categories; to permit the greatest possible amount of freedom in types of ownership of Town Houses and Town House developments; to prevent detrimental effects to the use or development of adjacent properties or the neighborhood; and to promote the health, safety, morals, and welfare of the present and future inhabitants of the District and of the County as a whole."

Then, after setting out the regulations which shall apply in the R-T zone (uses permitted, area requirements, etc.), the ordinance continues (section 111-12 i (2)) as follows:

"In reviewing the application the Department shall consider the standards and purposes of the R-T Zone with a view to achieving a maximum of safety, convenience and amenity for the residents of the Town Houses within the development."

It is clear that the ordinance sets out a number of purposes for the R-T zone and that the prevention of detrimental effects to the use or development of adjacent properties or the neighborhood is only one such purpose. Some of the purposes may be conflicting, e.g., (a) efficiently utilize available public utilities and services so as to prevent undue congestion in sections where such facilities are not available or cannot be conveniently and economically provided, and (b) prevent detrimental effect to the use of adjacent properties. The intent is to allow the Council to arrive at the best result given the numerous purposes set out (see the emphasis on *need* for granting the floating T-2 zone in *Costello v. Sieling,* 223 Md. 24, 161 A. 2d 824 (1960)), but this is not to say, as the majority seems to suggest, that there will be no detrimental effect to the neighborhood.

In *Costello v. Sieling, supra,* the second case applying the "floating" zone concept in Maryland, this Court upheld the

rezoning of a 92 acre tract located in Howard County from R (residential) to T-2 (trailer coach park) saying that the reclassified use was "not incompatible with the residential uses to which the remainder of the district is restricted and was not made for the primary benefit of a private owner but for the public good as well, * * *." (223 Md. at 33). The Court pointed out, however, that the County Commissioners granted the needed rezoning *in spite of the fact that a 260 acre adjoining tract would be adversely affected thereby.* In *Costello* there was an adverse effect that could be looked to to justify a zoning authority's decision to grant a zoning change or to create a buffer zone. In *Costello* the effect was adverse, but other changes in the character of the neighborhood brought about by the location of a floating zone could also justify board action. This Court should act only when the zoning boards' actions are "arbitrary, unreasonable and capricious." See *Sampson Bros. v. Board,* 240 Md. 116, 213 A. 2d 289 (1965).

In my opinion, the change in zoning to R-T is sufficient to justify the Council's action and the presumption should be, once the R-T change has been shown, that there has been a change in the character of the neighborhood, despite the finding of compatibility, absent persuasive evidence to the contrary. As pointed out above, a finding of compatibility *is not a finding of no change,* and a survey of a few cases suggests *prima facie* that a change in the character of the neighborhood results from the granting of a floating zone.

In *Huff v. Board of Appeals of Baltimore County,* 214 Md. 48, 133 A. 2d 83 (1957), the first "floating zone" case in Maryland, this Court upheld the rezoning of 18 acres of land in a Residential Use District (R-40) to Manufacturing, Restricted (M-R) to enable Diecraft, Inc. "to build a one-story plant to be used for the manufacture and assembly of small precision instruments, guided missile parts and electrical and communication devices for the Federal Government." *Prima facie* this "compatible" change in zoning, placing a *factory* in a *residential area,* changed the *character* of the neighborhood absent convincing evidence to the contrary. This change in the character of the neighborhood is sufficient to support a decision of a

zoning board creating, say, a buffer zone even if the change did no "harm" to the neighboring property.

In *Costello, supra,* a 92 acre tract was changed from residential (R) to trailer coach park (T-2) to accommodate in excess of eight hundred units. There has been, *prima facie,* a change in character.

In *Beall v. Montgomery County,* 240 Md. 77, 212 A. 2d 751 (1965), the Court upheld the rezoning of 41.6 acres of land from R-60 (one-family, detached residential) with a minimum lot area of 6000 square feet to an R-H zone (multiple-family, high-rise planned residential) on which 7 high-rise apartments containing 1855 apartment units were to be built. Again, the presumption should be that there has been a change in the character of the neighborhood.

It should be pointed out that the decision of the Council on December 1, 1964, granting the rezoning of the 3.81 acre tract across Georgia Avenue from the subject property, stated:

"After considering all of the evidence submitted, the Council finds that there has been a sufficient change in the character of the neighborhood to warrant the reclassification requested."

Both the Technical Staff and the Planning Board approved *this rezoning* to the R-T zone.

We have held that the Technical Staff reports, themselves, indicating a lack of change in conditions will make this issue fairly debatable and will justify the action of the Council in denying the rezoning. *Sampson Bros. v. Board, supra,* at Md. 119, A. 2d 291. See *Board v. Turf Valley Associates,* 247 Md. 556, 233 A. 2d 753 (1967). *A fortiori,* such reports indicating a sufficient change in condition in the neighborhood to justify the recommended rezoning makes the issue fairly debatable, where, after a field inspection, the Technical Staff makes the finding that the land to the west of the subject property is zoned R-T, to the east "are apartments under construction," and finds that the fragmented pattern of ownership and lack of sufficient access over Ara Drive, extremely narrow and not dedicated to public use, "makes additional single-family development in the area difficult, if not impossible."

The majority, in part ii of its opinion, relies strongly on this Court's decision in *Baker v. Montgomery County,* 241 Md. 178, 215 A. 2d 831 (1966), which reversed the Circuit Court for Montgomery County and the Council in granting a zoning change from R-90 to R-20 for the 32.61 acre tract of land lying to the north and northeast of Jingle Lane. Jingle Lane is approximately 700 to 1000 feet northwest of the subject property and the map indicates that the area between the subject property and the rear yards of the houses fronting on Jingle Lane consists of land for use as a large church complex and substantial amounts of vacant land. The Council in the present case, however, knew of the *Baker* decision and nevertheless granted the R-20 zoning in the present case. The Council most likely did not consider the decision in its opinion in the present case because the area involved in *Baker* is substantially separated from the subject property. In *Baker* we held that the application for rezoning was *void* because of failure to comply with certain mandatory requirements of the Montgomery County Zoning Ordinance. We did *say* that there was insufficient evidence offered to show a change in conditions and we did indicate that the Council, in granting R-30 rezoning in the case of *Marcus v. Montgomery County Council,* 235 Md. 535, 201 A. 2d 777 (1964), stated that it provided "a nice transition between the commercial and [the] R-90 zoning." But this *dictum* by no means results in legislative *rigor mortis.* Since then there has been a rezoning of land across the street to a town house use and, in addition to that, there is no reason apparent to me why the Council, if it thinks it to be in the public interest, should not *expand* the "buffer" zone to include the subject property. This was recommended in the present case by the Technical Staff whose report stated: "For these reasons, the Staff is of the opinion that the existing multiple-family zoning *should be extended* to include the land involved in Applications E-70 and E-71." (Emphasis supplied). The drawing of zoning boundary lines and the location and size of "buffer" zones is peculiarly within the expertise of the Technical Staff, the Planning Board and the Council. I would adhere to their judgment in this field.

I am baffled by the opinion of the majority in regard to the

discussion of "difficulties of access" (part iv). As the majority points out, the access to the subject property *is* difficult. There is only a 15 foot right-of-way running northeasterly from Georgia Avenue through the adjoining property and along the northwestern boundary of the Artery tract. This limited access is most certainly a factor to be considered in determining whether the subject property should be continued in a zone for single-family development, and, as already set forth, the Technical Staff was of this opinion. The majority indicates that this "problem has already been solved by the realignment of the proposed 70 foot road (P-9) along the southeastern boundary;" and that "oddly enough, the staff seems to have overlooked the fact that the proposed relocation and realignment of the 70 foot road (P-9) probably would solve whatever 'difficulties of access' there might have been." I submit that it was not "odd" at all, as the mere relocation of the road *on paper* will most assuredly *not provide access* to the subject property. The record clearly indicates that there has been no dedication of the "relocated" road or any acceptance by the public of it as a public way. There have been no eminent domain proceedings instituted to acquire the bed of the relocated road and no such proceedings are contemplated or in prospect. The Technical Staff, the Planning Board, the Council and the Circuit Court were doubtless dealing with existing conditions likely to continue for the foreseeable future and not with a "paper street" which is not likely to be available for many years and possibly may never be available for access to the subject property.

I must reiterate my firm opinion that the "change-mistake" rule should now be reconsidered and abandoned by this Court. My reasons are fully stated in my dissenting opinion in *MacDonald v. Board of County Commissioners*, 238 Md. 549, 604, 210 A. 2d 325 (1965), and will not be repeated here. I need only observe that the rule does not improve upon application. The formulation and application of the rule, in my opinion, was, and continues to be, a departure from sound doctrine and has opened up a veritable "Pandora's Box" of zoning errors. It is high time to close the lid.

I would affirm.