BROWN, ET AL. *v.* WIMPRESS, ET AL.

[No. 205, September Term, 1967.]

*Decided May 31, 1968.*

The cause was argued before HAMMOND, C. J., and HOR-
NEY*, MARBURY, BARNES, McWILLIAMS and SINGLEY, JJ.

*Robert L. Burchett,* with whom were *James R. Miller, Jr.,*
and *Miller, Miller & Canby* on the brief, for appellants.

*C. Edward Nicholson* for Richard S. Wimpress, et al., part
of appellees; *David E. Betts* for Evening Star Broadcasting Co.

another appellee; and *Carter C. Hubbel, Jr., Assistant County Attorney*, with whom were *David L. Cahoon, County Attorney*, and *Alfred H. Carter, Deputy County Attorney*, on the brief, for Montgomery County, Maryland, other appellee.

HAMMOND, C. J., delivered the opinion of the Court. BARNES, J., dissents. Dissenting opinion at page 210, *infra*.

On July 26, 1966, less than four months before its members left office at the insistence of the voters of Montgomery County and were replaced by a Council of newly elected members, the District Council rezoned from R-90 to R-20 a 38-acre tract of land lying southeast of the intersection of Democracy Boulevard and U. S. Route 240, although in January 1964 it had denied a similar application to rezone the land from R-90 to R-10. Protestants appealed to the Circuit Court. In its pleadings the new Council confessed that its predecessor Council had acted arbitrarily and capriciously in granting the rezoning, and asked that its action be reversed. Judge Mathias found that the granting of the rezoning had been unsupported by evidence before the Council and was therefore illegal. We agree with both Judge Mathias and the new Council.

In 1957 the master plan for the Cabin John watershed area was adopted by the Maryland-National Capital Park and Planning Commission which (1) proposed a clover leaf interchange between two major arterial highways, Democracy Boulevard and U. S. Route 240, (2) designated the southeast quadrant of the intersection, of which the subject property is a part, as a separate planning area designated V-C2, with R-90 zoning, (3) designated the northeast quadrant (the Floyd Davis tract) as a separate planning area, zoned R-90 and including an employment center, and (4) designated the northwest quadrant as a shopping center. The southwest quadrant was and is a country club with adjacent rural residential housing.

The District Council implemented the recommendations of the planning authority by comprehensively rezoning the area, including the four quadrants, in accordance with the master plan, by sectional map amendment effective April 22, 1958.

Five years later the present appellants filed an application for rezoning of their 38-acre parcel to R-H or R-10; later they

withdrew their request for R-10. Both the technical staff and the planning board recommended denial of the requested rezoning because its granting would violate the Cabin John master plan by placing multi-family units in a neighborhood where (1) they would be in the midst of the overwhelmingly predominant single-family residential development; (2) they would be separated from commercial areas by interchange ramps and the "freeway" (Democracy Boulevard); (3) they would have a density three times greater than contemplated by the master plan; and (4) the traffic problems would be great "since traffic resulting from apartment development would necessitate a direct entrance to Democracy Boulevard at a point too close to the intersection ramps to satisfy good standards of design."

The Council, in denying the reclassification, concurred in the views of the Planning Board and noted that the shape of the tract (relatively long and narrow) would present:

> "a maximum of perimeter to the adjoining residential area [several hundred acres of land developed as single-family homes, with the exception of radio towers, a non-conforming use], and that its narrowness would make it difficult to develop the property to its maximum capacity [under the R-10 classification]."

The Council also said: "We are particularly mindful of the likelihood of severe traffic problems developing as the result of the location of a high-rise apartment project in an area of relatively limited access." The Council then added this statement:

> "For these reasons and because to deny this application will aid in the accomplishment of a coordinated, comprehensive, adjusted and systematic development of the Maryland-Washington Regional District, the application will be denied."

When the appellants later sought rezoning for a high-rise apartment project, the technical staff and the planning board again recommended denial on January 18, 1966, finding that:

> "This application is identical with Application C-1119 [the 1963 application], except that it requests the R-H or R-20 zone while the previous case re-

quested the R-10 or R-H. Application C-1119 was denied on January 21, 1964; this action was then appealed to the Circuit Court (Law No. 14884), but the appeal was dismissed on November 29, 1965, the same day that the present application was filed.

"In the case of C-1119 the applicant requested that the Council consider only the R-H proposal and disregard the alternative R-10; and since the R-H is again the principal request in the present application, the two applications are substantially the same. The facts and the appropriate conclusions to be drawn from them are also identical, since nothing in this area has changed in the last two years in such a manner as to alter these conclusions."

The planning board, after reiterating its prior objections to the rezoning, found that:

"it would therefore become necessary to enter Democracy Boulevard directly from the tract, at a point much too close to the interchange ramps to satisfy good standards of design.

"The same considerations militate against the R-20 zone. This would permit about 800 [high-rise] dwelling units as compared to 1600 in the R-H zone, but all of the same problems are present nevertheless."

In 1966, in direct contrast to 1964, the Council disagreed with the technical staff and the board, saying:

"The District Council, after thorough consideration of the exhibits of record and testimony presented at the hearing disagrees with the Planning Board and Staff and feels that the present application should be granted for the R-20 zone. The Council finds that the many changes in the area necessitate a buffer being placed between the single family residences to the southeast and the heavy commercial and the heavy industrial zonings to the northwest and north.

"The Council feels that the topography and the con-

tour of the subject property do not lend themselves to single family residential development. * * *

"The Council also finds that, since there will be access from the subject property onto Democracy Boulevard, neighboring single family residential development will not be over-burdened with traffic.

"For these reasons and because to grant these applications will aid in the accomplishment of a coordinated, comprehensive and systematic development of the Maryland-Washington Regional District, Application No. E-594 will be granted for the R-20 zone, as more particularly described in the Resolution below."

It is apparent to us that the Council acted without legal justification and arbitrarily and capriciously in 1966 in various ways.

The Cabin John Plan comprehensive rezoning of 1958 chose to use wide major highways as dividing lines between the four neighborhood quadrants at the intersection of Democracy Boulevard and U.S. Route 240. We have consistently recognized that this properly and logically can be done. *Hewitt v. Baltimore County,* 220 Md. 48, 60 ("The Baltimore-Harrisburg Expressway now forms a substantial physical barrier between the property lying to the east of it and that lying to the west * * *. It would be difficult, to say the least, to think of a more logical line of demarcation between the industrial and commercial zones to the east and the residential zone to the west of this barrier.") ; *Shadynook Imp. Ass'n v. Molloy,* 232 Md. 265, 272; *Kaslow v. Rockville,* 236 Md. 159; *Stocksdale v. Barnard,* 239 Md. 541; *Leroux v. Baltimore,* 248 Md. 106, 110-11 (residential on one side of the street—commercial on the other—"It is consonant with the procedure followed in zoning areas to have a street be the dividing boundary between zones of different classifications").

In 1964 the Council did not find change from 1958 sufficient to justify rezoning the subject property. In 1966 no witnesses were produced to show change. The owner's lawyer made a plea for the requested rezoning and offered for consideration by the Council by reference to their application numbers some seven-

teen changes he regarded as showing substantial change in the character of the neighborhood. Some of these were on the far side of U. S. Route 240 in the northwest quadrant, a separate planning area, and were consistent with and envisaged by the comprehensive rezoning of 1958.

Other changes relied on by the owner's lawyer before the Council were on the far side of Old Georgetown Road north of Democracy Boulevard opposite the northeast quadrant, again in a separate planning and zoning neighborhood. The appellants' main reliance, however, is on granted but not yet utilized zoning changes in the northeast quadrant, the Davis tract.

In *Bigenho v. Montgomery County*, 248 Md. 386, 392-93, we dealt with the Council's rezoning of the 270 acres constituting the Davis tract. The Council early in 1966 granted five reclassifications of the R-90 tract, four of which were floating zones— C-P, R-H, and two I-3s. We upheld these rezonings and the fifth, an Euclidean rezoning, saying:

> "In considering these safeguards it is to be borne in mind that the area affected was not a developed integrated portion of the existing community. Rather, it was an undeveloped tract insulated from the surrounding neighborhood by heavily travelled major thoroughfares. Therefore, the use of the entire tract will have a minimal impact on the community as a whole. Also to be considered is the size of the subject property. When a tract as large as this is reclassified there is little possibility of its being invidious spot zoning. The Davis tract embraces an area large enough to be considered a community in itself and when it is zoned into several classifications it is as important to consider whether the permitted uses are in harmony with each other as it is to ascertain if the entire proposed development is compatible with the surrounding neighborhood.

> "As to the granting of the C-P classification for E-643 and the I-3 classification in E-644 and E-645 we find that the evidence before the Council was at least fairly debatable and accordingly, that Judge Shure was correct in affirming the Council's action. The 1957

Master Plan showed a symbol on the south west portion of the Davis tract indicating that an employment center was to be located there. The uses permitted under I-3 and C-P are especially keyed to fulfill the anticipations of the planners with respect to such an employment center. The uses permitted by the C-P zone could have reasonably been found not in conflict with existing uses in the community and their effect was minimized by their location at the juncture of two interstate highways and the fact that the remainder of the parcel is contiguous to the I-3 and R-H zones that are parts of the subject tract.

"Ordinarily an industrial use is thought to be at variance with the maintenance of the standards usually associated with a residential community. Thus the purposes and restrictions provided for in the I-3 classifications must be specifically scrutinized. Montgomery County Code (1965), Section 111-24 establishing the I-3 zone states as follows:

'The purpose of the industrial park (I-3) zone is to provide a protective zone for a park-like development of industry that is based on the performance of an industry as well as on the type of industry. In order to secure this type of development, the various regulations herein described must be met. These regulations have been established so as to provide a healthful operating environment for industry, for the the protection of industry from the encroachment of commercial and residential uses adverse to the operation and expansion of such industry and to protect industries within the district from the adverse effect of other incompatible industries, and, at the same time, to reduce to a minimum the impact of industries on surrounding nonindustrial land uses; to lessen traffic congestion; to protect the health and safety of the residents or workers in the area; to prevent detrimental effects to the use or development of adjacent properties or the general neighborhood; and to promote the health, safety, morals, comfort

and welfare of the present and future inhabitants of the district.'

"A further perusal of this section indicates that the permitted uses under this classification are regulated in such a way as to provide a minimum effect on neighboring activities. Furthermore, the land under this classification is separated from contact with any residential area by heavily travelled divided highways."

We thus recognized in *Bigenho* that the northeast quadrant was a separate neighborhood and that the changes there did not effect a substantial change in the character of the neighborhood known as the southeast quadrant which, like the northeast quadrant, is "insulated from the surrounding neighborhood by heavily travelled major thoroughfares"—U. S. Route 240, Democracy Boulevard, the Capitol Beltway and Old Georgetown Road. The Council recognized this in its rezoning of the Davis tract, when it said: "The built-in protections of the I-3 classification offer adequate protection to the single-family dwellings across Democracy Boulevard." (248 Md. at 396)

It is conceded that the entire southeast quadrant, apart from the subject property and the non-conforming portion occupied by the radio towers of the Evening Star Broadcasting Company, has been developed as zoned and is filled with single-family residences. No change whatever has been shown in the character or use of the southeast quadrant neighborhood. The appellees did show that their 38 acres could be developed by 99 individual homes. A rezoning of the 38 acres to multi-family use would result in a substantial change in the character of the neighborhood. (In *Bosley v. Hospital,* 246 Md. 197, 204, we said:

"Moreover, the rezoning changes subsequent to November 1955, previously discussed, were important changes in the law and resulted in the substantial changes in the character of the neighborhood even though all of the rezoning changes were to more intensive residential use by an increase in density from R-6 or R-10 to R-A.")

There was no evidence before the Council to support or justify its decision to rezone the 38 acres to multi-family use. This being so, the Council's action was invalid and ineffective.

There are further indications that the Council acted arbitrarily and capriciously. In 1964 it denied multi-family use of the 38 acres; in 1966 it granted such use, although as the Planning Board correctly noted in comparing the 1966 and 1964 applications: "The facts and the appropriate conclusions to be drawn from them are also identical, since nothing in this area has changed in the last two years * * *." *Lambert v. Seabold,* 246 Md. 562; *Woodlawn Ass'n v. Board,* 241 Md. 187; *Polinger v. Briefs,* 244 Md. 538; *Leroux v. Baltimore,* 248 Md. 106; *The Chatham Corp. v. Beltran,* 243 Md. 138; *Whittle v. Bd. of Zoning Appeals,* 211 Md. 36; *cf. Gaywood Ass'n v. M. T. A.,* 246 Md. 93.

The Council found in 1966 that "the topography and the contour of the subject property do not lend themselves to single-family residential development," although the owners themselves showed, without contravention, that 99 single-family homes could be placed in the tract under the existing zoning and although in 1964 the Council found "that the shape of the tract is such that it presents a maximum of perimeter to the adjoining residential area, and that its narrowness would make it difficult to develop the property to its maximum capacity under either the R-H or R-10 zones."

In 1964 the Council found "the likelihood of severe traffic problems developing" as a result of traffic entering and leaving Democracy Boulevard "at a point too close to the intersection ramps * * *."

In 1966, without any change in conditions, the Council found "that, since there will be access from the subject property onto Democracy Boulevard, neighboring single-family residential development will not be overburdened with traffic."

Finally, the Council in early 1966, in rezoning the Davis tract across Democracy Boulevard from the southeast quadrant and the subject property, found that: "The built-in protections of the I-3 classification [along the north side of Democracy Boulevard] offer adequate protection to the single-family dwellings across Democracy Boulevard." Later in 1966, in rezoning the

38 acres here involved, the Council found "that the many changes in the area necessitate a buffer being placed between the single-family residences to the southeast and the heavy commercial and the heavy industrial zonings to the northwest and north." The commercial zonings to the northwest were on the 1958 comprehensive rezoning map and U. S. Route 240 and Democracy Boulevard were buffers between them and the southeast quadrant. The industrial zonings to the north were found early in 1966 to be, by virtue of their "built-in protections" along the north side of Democracy Boulevard, adequate buffers for the southeast quadrant.

We have held from time to time that it is arbitrary for a zoning body which earlier has relied on the premise that a property being rezoned will serve as a buffer later to rezone an adjacent or nearby property on the sole ground that the first rezoning was a substantial change in the character of the neighborhood and thus justifies an extension of the buffer. *Levy v. Seven Slade, Inc.*, 234 Md. 145; *Randolph Hills Inc. v. Whitely*, 249 Md. 78; see also, *Wahler v. Montgomery County Council*, 249 Md. 62. In rezoning for apartment use the property dealt with by us in *Beth Tfiloh v. Blum*, 242 Md. 84, the Board of Appeals of Baltimore County said that its eastern boundary would be the buffer line between apartment use and single-family use. Soon after, in the case dealt with in *France v. Shapiro*, 248 Md. 335, the Board moved the buffer line to the easternmost line of the Shapiro tract which lay to the east of the Beth Tfiloh tract. We reversed the Board.

The order of the Circuit Court for Montgomery County reversing the Council will be affirmed.

*Order affirmed, with costs.*

BARNES, J., dissenting:

I dissent because, in my opinion, there was sufficient change in the character of the "neighborhood" of the subject property to make the rezoning of that property to R-20 fairly debatable and hence permissible under the "change-mistake" rule.

It is entirely correct as stated in the majority opinion that we have recognized that wide major highways may properly be

used as a dividing line between zones of different classifications. I have never understood, however, that our prior decisions made these major highways zoning replicas of the Great Wall of China keeping the land directly across the highway from being in the "neighborhood" of a property considered for rezoning under the unfortunate "change-mistake" rule to which the majority of the Court still adheres.[1]

In my opinion, there is a substantial difference between what may properly constitute a proper planning area and what constitutes a neighborhood.

In the present case it can hardly be maintained that the zoning or rezoning in the northeast quadrant of the intersection of U.S. Route 240 and Democracy Boulevard does not directly and intimately affect the character of the use and enjoyment of the land directly across Democracy Boulevard in the southeast quadrant of the intersection. This indicates to me that the zoning in the northeast quadrant, made up substantially of the Davis tract, is in the "neighborhood" of the property approximately 120 feet away across Democracy Boulevard in the southeast quadrant. The Council properly recognized this *fact* in its decision to rezone the Davis tract consisting of 270 acres on April 26, 1966, from R-90 (one-family, detached, restricted residential) to five new zones (four "floating" and one "Euclidean") as follows: 10 acres to C-1 (local commercial); 57 acres to C-P (commercial office park); 27 acres and 118 acres to I-3 (industrial park); and 54 acres to R-H (multiple-family, high-rise planned residential).

We sustained the rezoning of the Davis tract in *Bigenho v. Montgomery County Council*, 248 Md. 386, 237 A. 2d 53, (1968). As our opinion in *Bigenho* indicates, it is anticipated that an employment center will be established on the Davis tract as rezoned, as well as various industrial uses and high-rise apart-

---

1. I have given the reasons why, in my opinion, the Court should abandon the "change-mistake" rule which has been created by our prior decisions, resting, as I see it, on illogical and erroneous premises. See my dissenting opinions in *Wahler v. Montgomery County Council*, 249 Md. 62, 71, 238 A. 2d 266, 271 (1968) and in *MacDonald v. Board of County Comm'rs for Prince George's County*, 238 Md. 549, 604, 210 A. 2d 325 (1965).

ments. The Council in granting the rezoning of the Davis tract indicated in its opinion that "The built-in protections of the I-3 classification offer adequate protection *to the single-family dwellings across Democracy Boulevard.*" (Emphasis supplied.) The Council obviously was of the opinion that the single-family dwellings across Democracy Boulevard in the southeast quadrant were in the neighborhood of the Davis tract and should be considered by the Council in reaching its decision in regard to rezoning the Davis tract in the northeast quadrant.

A number of the protestants in *Bigenho* were property owners of single-family dwellings in the southeast quadrant. They undoubtedly believed that the Davis tract was in their "neighborhood" and that the rezoning of that tract directly affected the use and value of their properties. Indeed they could not have been parties in *Bigenho* if they had not been "persons aggrieved" by the Council's action. See *Bryniarski v. Montgomery County Board of Appeals,* 247 Md. 137, 230 A. 2d 289 (1967).

In my opinion, if persons are aggrieved by a rezoning of nearby property, the rezoned property of necessity is in the "neighborhood" of the property adversely affected. In short, the Davis tract is in the "neighborhood" of the properties in the southeast quadrant and the zoning changes there were sufficient, in themselves, to result in a change in the character of the neighborhood and justify a rezoning of land in the southeast quadrant under the "change-mistake" rule.

It should be observed that the Council did not in the present case rezone the subject property to either R-H or R-10 for which rezoning was denied by the Council in the prior case decided January 21, 1964. It granted rezoning to R-20, a multiple-family, medium density residential zone. The R-20 zone has a maximum density of 21.7 dwelling units per acre. On sites with more than five acres—such as the site involved in the present case—the main building heights are up to 80 feet with an increase in the minimum front, side and rear yards to provide more depth of open space surrounding the building or buildings. In the present case, if a building were erected to a height of 80 feet, it would be required to have a front yard of 180 feet. The provisions of the Ordinance creating the R-20

zone require that there be at least 2000 square feet of net lot area per dwelling unit and that not more than 18% of the net lot area be occupied by multi-family dwellings. The ordinance also provides that not less than 60% of the net lot area shall be devoted to green area, which is 5% more than the 55% requirement for green area in the R-H zone and 10% more than the 50% requirement in the R-10 zone. The density under the R-20 zone provisions would be approximately 800 dwelling units as contrasted with 1600 dwelling units in the R-H zone. In the R-10 zone the maximum permissible density is 43.5 dwelling units per acre as compared with 21.7 dwelling units per acre in the R-20 zone. It is clear, therefore, that the granting of the application for R-20 zoning in the present case involves different zoning provisions and criteria from those involved in the previous case in which the applicants sought either R-H or R-10 zoning.

As I indicated in my dissenting opinion in *Wahler v. Montgomery County Council,* 249 Md. 62, 71, 238 A. 2d 266, 271 (1968), I can see no reason why the Council, as the legislative body with jurisdiction to make the rezoning determination, cannot determine, after substantial zoning changes in the neighborhood have occurred, that the public interest requires that an additional or different buffer zone be established for properties affected by those changes. The majority indicates that the decision of the Court in *France v. Shapiro,* 248 Md. 335, 236 A. 2d 726 (1968)—in which I did not participate—forbids this. I am of the opinion that the *France* case was erroneously decided and that it should be overruled.

I have indicated a number of times that, in my opinion, the correct test for judicial review in rezoning matters—as in other legislative matters—is whether or not the legislative body acted in an arbitrary, unreasonable and capricious manner. There was, in my opinion, sufficient evidence in the present case to make the rezoning fairly debatable and thus to justify the Council's rezoning action. The subject property is a long, relatively narrow, unimproved curved area of 38 acres adjacent on the north and west to Democracy Boulevard and U.S. Route 240. It is a wooded area, with an irregular terrain. To the south are the radio towers and facilities of radio station WMAL. As already

indicated, the buildings for industrial uses, high-rise apartments and the employment center will be erected to the north of Democracy Boulevard in the northeast quadrant. In the northwest quadrant, directly across the clover leaf from part of the subject property, is one of the area's largest shopping center developments which also contains apartment buildings. There was evidence that the subject property had 230 feet of access on Democracy Boulevard and neither the State Roads Commission nor the Federal Bureau of Public Roads has denied access to the subject property. There was evidence from which the Council could conclude that there would be no undue hazard from traffic. The Council on all the evidence found the following:

> "The Council finds that the many changes in the area necessitate a buffer being placed between the single family residences to the southeast and the heavy commercial and the heavy industrial zonings to the northwest and north.
>
> "The Council feels that the topography and the contour of the subject property do not lend themselves to single family residential development. The Council likewise feels that the development of R-20 zoning in this spot with its required deep setbacks would be a more effective buffer to the commercial and industrial developments than would the development in its present zoning.
>
> "The Council also finds that, since there will be access from the subject property onto Democracy Boulevard, neighboring single-family residential development will not be overburdened with traffic."

In my opinion, a reasonable legislator, on the evidence before the Council, could reach this conclusion as the issues were fairly debatable. Even if we might be of the opinion that the result reached by the Council on the evidence is not one which we would have reached, nevertheless we should not substitute our judgment for that of the legislative body when the matter is fairly debatable. *Bigenho v. Montgomery County Council, supra; Pallace v. Inter City Land Co.,* 239 Md. 549, 212 A.

2d 262 (1965) ; and *DePaul v. Board of County Commissioners for Prince George's County,* 237 Md. 221, 205 A. 2d 805 (1965) and cases therein cited. I would reverse the lower court's order reversing the resolution of the Council and reinstate the Council's resolution granting the R-20 rezoning.