## HOOPER ET UX. *v.* MAYOR AND CITY COUNCIL OF GAITHERSBURG

[No. 103, September Term, 1973.]

*Decided January 3, 1974.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*William C. Staley*, with whom were *Staley, Prescott & Ballman* on the brief, for appellants.

*Joe M. Kyle*, with whom was *Richard F. Stefanelli* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

That age does not wither nor custom stale the infinite variety of Montgomery County zoning cases is further borne out by the dispute now before us. Indeed, as we shall see, it seems more a feud than a dispute. The facts and circumstances will more easily be understood by reference to the accompanying plat.

The appellants (Dr. Hooper) own [1] lots A, B, C, D, E-1 and E-2. In 1965 Dr. Hooper succeeded in having lots A, B, C and D reclassified from R-90 (Medium Density Residential and Cluster Option) to R-O (Planned Residential), a classification in which medical offices are permitted. There are buildings on lots A and B. He proposes to build on lot C and on lot D.

---

1. From here on the singular will be used.

The surrounding properties are in the R-20 (Medium Density Residential) classification to the west and northwest and in the R-90 classification to the east and northeast. Lots E-1 and E-2 are in the R-90 classification.

In connection with both the existing buildings and the buildings he intends to place on lots C and D, Dr. Hooper proposes to pave lot E-1 and use it for 21 additional parking spaces. This will be impermissible unless he succeeds in having it reclassified to R-O. To this end, on 10 February 1972, he applied to the City Planning Commission of Gaithersburg for the reclassification of lot E-1 from R-90 to R-O.

On 31 March the staff of the Planning Commission, after a hearing on 15 March, recommended approval of the application. In its communication to the Commission the staff stated, in part:

" . . . The proposed rezoning would retain the residential character of the Gaither Road frontage. It is reasonable for the rear of the lot to be rezoned to permit an extension of the medical center. The subject rezoning would make better use of the land in two respects.

1) development of vacant land

2) development of land into its higher and best use.

"The staff agrees with the applicant that a change in the character of the neighborhood has occurred in the past seven years. Although the Deer Park subdivision was nearly complete the number of people who have moved into the community, the additional traffic generated and the need for additional medical facilities serving this area of Gaithersburg could be easily demonstrated. The character of Frederick Avenue has substantially changed by an increase of use to the point that a major road widening project will soon be undertaken. Deer Park Drive between Gaither Road and the B & O Railroad has been programmed

in the City's Capital Improvement Budget for widening and improvement for several years. This project now looks like it is close to implementation. The medical center will therefore have improved access for its users.

"Dr. Hooper proposes if the tract is rezoned to use that tract to fulfill parking requirements for a building planned on the existing R-O property. The rezoning is necessary because parking is not permitted for uses other than those permitted by right in the R-90 zone. Medical office uses are not permitted in R-90, hence the need to request a change in zoning.

"The Master Plan depicts this subject tract as single family residential. Neither the applicant or the City contemplated this particular approach to the 12,000 sq. ft. involved in the rezoning. Staff therefore feels that the rezoning would not be contrary to the intent of the Master Plan because of the detail of a point of a single property of less than a half acre, vs. the approach of the Master Plan as a general guide of future land use."

The Commission, however, elected not to follow the recommendation of its staff. In its communication of 5 May to the Mayor and Council it recommended the denial of the application, stating in part:

"The primary reason for recommending denial was to preserve the residential integrity of the neighborhood and not create further pressure to rezone in the neighborhood by granting this application."

The transcript of the public hearing before the Mayor and Council, held on 5 June, discloses a lengthy colloquy between the Mayor and Council on one hand, and counsel for Dr. Hooper on the other. Discussed in detail were his plans for the use of lot E-1. Quentin V. Frey, a land planner, gave more elaborate testimony in respect of Dr. Hooper's plans and intentions. A statement of E. L. Dieudonne, Jr.,

"Realtor-Appraiser," was admitted into evidence. He described the property; he thought the reclassification would not have an adverse effect on the plan or on the character of the neighborhood. In summary he said the "rezoning would logically conform in every way to the aims and purposes of the R-O zoning category." All present agreed, assuming the reclassification to R-O, that he (Dr. Hooper) could build on E-1 despite his declared intention to use it only for parking. Three nearby residents spoke in opposition. The Mayor and Council voted unanimously to hold the application open for ten days. During this period a few people sent in letters — some for, some against.

At the 3 July meeting of the Mayor and Council, Dr. Hooper's application was discussed in some detail. The excerpts from the transcript of the meeting, set forth below, reflect the concern of the Mayor and Council:

"Mayor Morris: . . . Gentlemen, I don't know whether it is proper or not, but I wish Mr. Kyle [the City Attorney] were here. *I must say that I see no disabuse in the use of this land as proposed.* I cannot recommend to you that you grant this *based on the past actions of the applicant,* because none of the requisites of the site plan, not none, I'd say none, but many of the requisites of the site plan have not been complied with on the adjacent land. *There is a long history of noncompliance* and I personally cannot see buying more, not buying, giving ourselves more problems along this line when *in open hearing there was no assurance given that this was going to be complied with on this particular parcel of ground.* . . .

\* \* \*

"Councilman Fullerton: If I understand you correctly, Mr. Mayor, what you are saying is in essence that you feel that the application, *if it were not for other past history of our dealings with Dr. Hooper, you feel it would be a logical thing for the City to approve,* but because of the history of our

noncompliance with other remaining land there, it would be your suggestion that we should not buy more trouble and approve this application?

"Mayor Morris: That based on past history, Mr. Fullerton, I do not believe that this land is intended, it is my personal opinion, is not intended to be developed in the terms of our site plan ordinance, and I only have past history to go on, I wish it were not so, but I, and I reiterate, *I think it is the proper use of the land, a logical extension and a good use of the land, but I can't see anything except further problems.*

"Councilman Walker: . . . My concern is that he will put a building on it and if he puts one on it, it's up to us to see that it's right. I just can't see denying it for what has happened in the past. I think, I don't know, it's a club, but I just can't.

\* \* \*

"Councilman Walker: *So he hasn't really proven that he needs additional spaces to comply with our ordinance, he simply says that he wanted to increase at his own free will,* and therefore that proves to me that the land is available for another building and I would, but for Mr. Staley or Mr. Frey to guarantee us, which they apparently intended to do the night of the hearing, that nothing would be put there but parking was not a valid statement. Neither Mr. Staley nor Mr. Frey could be in his employment tomorrow. *So once he gets zoning he can do with it as he sees fit as long as he complies.* This is certainly a concern, but my main concern is that this area is giving the people in the City of Gaithersburg a public service which we badly need, and I just strongly, I have strong convictions about denying anything of that kind. I think we need it, it's unfortunate that we have this background, *but I'm not at all convinced it will be used solely for parking.*

\* \* \*

"Councilman Shay: I would suggest gentlemen that we defer until Mr. Kyle is with us. Somehow I've got a feeling that you could work out something that would not be contingent zoning. A concern that I raised in the Planning Commission is one of this property in that area, as that map that Charlie has outlined to you, being a key that if it goes to be prepared for the additional area. *If that property were to be rezoned for strictly parking only, if Joe can work that out somehow,* that way you don't have the whole area turning commercial down there." (All emphases supplied.)

What follows is an excerpt from the minutes of the 17 July meeting of the Mayor and Council:

"Councilman Shay: Mr. Kyle, the question before Council at the last meeting, that you were not here, was in regards to the use of the land in the proposed rezoning. The applicant in public hearing testified that it is his proposal to use this land as a parking lot. The zoning that is before the Mayor and Council would authorize the use of the R-O zone which would allow a parking lot and many other uses. *The question was could the zoning be limited to strictly a parking lot in the R-O zone or would the resolution adopt the R-O zone with all of its uses?*

"City Attorney Kyle: Mr. Shay, *I suppose that if the applicant were willing to do it, we could probably work out a covenant conditioned upon a favorable grant,* the grant of the zoning application, which we could make enforceable. That would be a matter of contract between the property owner and the City. ... I don't see anything you can do in your zoning resolution that would be effective to accomplish that." (Emphases supplied.)

A motion that the application be deferred and that the "City Attorney be instructed to work out a covenant providing for parking and screening on" lot E-1 was carried unanimously.

The minutes of the 21 August meeting of the Mayor and Council recite that:

"City Attorney Kyle reported he was informed by the applicant's attorney that he has advised his client he does not believe the execution of a covenant would be in his interest."

Whereupon the Mayor and Council, without making any finding of fact, adopted a resolution denying the application.

In September Dr. Hooper filed a bill for an injunction praying a declaration that the 21 August resolution was null and void and that the Mayor and Council "be enjoined from interfering with the use of . . . [lot E-1] in any way or manner permitted in the R-O" zone. In mid-March 1973 the case came on for a hearing before the chancellor, Joseph M. Mathias, J. What follow are excerpts from his opinion:

"It would appear that Dr. Hooper and his wife should have proceeded by way of an appeal pursuant to Article 66B. The defendant however consents to having the Bill of Complaint treated as an appeal under the Administrative Appeal Procedures of Article 66B. We shall treat it as such.

\* \* \*

"The contention on which Dr. and Mrs. Hooper rely most heavily is that the R-O classification constitutes a floating zone and that therefore they are not required to show original mistake or change in the character of the neighborhood in order to prevail.

" 'A floating zone is a special detailed use district of undetermined location, a district in which the proposed kind, location, size and form of structures must be pre-approved, and which, like a special exception use, is legislatively pre-deemed compatible with the areas in which it may thereafter be located on a particular application, provided specified standards are gratified and actual incompatibility is not revealed.' *The Chatham Corp. v. Beltram,* 243 Md. 138 at 149-50.

"Although applicants professed they wanted to use the property for off-street parking, there is no way that they could be restricted to such use were the requested rezoning to be granted. Once zoned, the property could be used for any one of the many and varied uses permitted under the R-O classification. We find in the ordinance no provision for *pre-approval* of the location, size or form of structures that might be placed on the property pursuant to R-O zoning.

"We cannot say therefore that the application before us meets the floating zone requirement that 'the proposed kind, location, size and form of structures must be pre-approved.'

"Our Court of Appeals has said in discussing the floating zone concept that it partakes of the nature of a special exception.

' . . . the floating zone is subject to the same conditions that apply to safeguard the granting of special exceptions . . . special precautions are to be applied to insure that there will be no discordance with existing uses. These precautions include . . . a provision for revocation of the classification if the specified restrictions are not complied with.' *Bigenho v. Montgomery County Council,* 248 Md. 386 at 391.

There is no such precautionary provision in the Gaithersburg zoning ordinance.

"It is our conclusion that we are not here dealing with a floating zone and that therefore it was incumbent upon applicants to show change in the character of the neighborhood. (Applicants conceded that there was no mistake in the original zoning.)"

We think Judge Mathias has it quite right in respect of the contention that the R-O classification is in fact a floating zone and, lest it be thought that he may have given it short

shrift, we should observe that it is rather late in the day to be rehashing the cases which firmly establish the characteristics of the floating zone. See cases cited in 23 M.L.E., *Zoning and Planning* § 27.

No evidence of a substantial change in the character of the neighborhood was offered by Dr. Hooper. Indeed, no effort was made to delimit the neighborhood. He seeks to skirt the former omission by claiming the Mayor and Council made such a finding in 1965 when it reclassified lots A, B, C and D from R-90 to R-O and that it has offered no evidence in the case at bar to suggest that "the conditions as they were found to be in 1965 had changed." We think he is clutching a straw, a very damp straw. *Brown v. Wimpress*, 250 Md. 200, 210, 242 A. 2d 157 (1967). In fact, the record suggests the Mayor and Council made no such finding in 1965.

While the Gaithersburg Zoning Ordinance does not impose upon the Mayor and Council a requirement that its zoning decisions be accompanied by findings of fact, Code (1970 Repl. Vol.), Art. 66B, § 4.05 (a) requires the legislative body to make findings of fact in each specific case "where the purpose and effect of the proposed amendment is to change the zoning classification." In recent years we have chided a number of agencies for delinquency in this regard. Indeed Judge Singley, writing for the Court in *Baker v. Board of Trustees of the Employees' Retirement System of the City of Baltimore*, 269 Md. 740, 747, 309 A. 2d 768 (1973), was moved to say:

> " . . . To be certain that the teaching of *Adams* [*Adams v. Board of Trustees*, 215 Md. 188, 195, 137 A. 2d 151 (1957)] is not again overlooked, we propose to remand, for appropriate findings of fact, any case which hereafter reaches us in the posture of this one."

We shall not, however (as we did in *Pistorio v. Zoning Board of Howard County*, 268 Md. 558, 302 A. 2d 614 (1973)), remand this case to the Mayor and Council for a finding of facts. To do so would be futile. It is clear that the only possible finding would be that there is a complete lack of any

evidence of a substantial change in the character of the neighborhood. Had Judge Mathias remanded it, however, it is unlikely we would have disturbed his decision.

One wonders, and perhaps Dr. Hooper ought to wonder, what might have developed if the Mayor and Council had reclassified lot E-1 to R-O and there had been an appeal by the opponents. It is surely unlikely it could have survived a well-mounted attack. Even if he had executed the covenant prepared by the City Attorney the attack could scarcely have failed. *Montgomery County, Maryland v. National Capital Realty Corp.*, 267 Md. 364, 374, 297 A. 2d 675 (1972).

Since Dr. Hooper makes much of the staff's finding that "a change in the character of the neighborhood has occurred in the past seven years" we shall add a brief comment. The reasons given in support of its finding strike us as being so much flubdub. A "number of people . . . have moved into the [Deer Park] community"; they have generated "additional traffic"; probably they will need "additional medical facilities." Frederick Avenue and Deer Park Drive will be widened at some future time. The medical center will "have improved access for its users." Just how a change in the neighborhood is thereby effected is beyond our comprehension.

*Decree affirmed.*
*Costs to be paid by the appellants.*