## MEGINNISS, ᴇᴛ ᴀʟ. *v.* TRUSTEES OF THE SHEPPARD AND ENOCH PRATT HOSPITAL, ᴇᴛ ᴀʟ.

[No. 285, September Term, 1966.]

*Decided May 15, 1967.*

The cause was argued before Hᴏʀɴᴇʏ, Mᴀʀʙᴜʀʏ, Bᴀʀɴᴇs, McWɪʟʟɪᴀᴍs and Fɪɴᴀɴ, JJ.

*Ernest C. Trimble* for appellants.

*M. William Adelson* and *Eugene P. Smith,* with whom was *Andrew E. Adelson* on the brief, for appellees.

Bᴀʀɴᴇs, J., delivered the opinion of the Court.

The appeal in this case was taken from an order of May 27, 1966, by the Circuit Court for Baltimore County (Menchine, J.), affirming an order of the Baltimore County Board of Appeals. The Board had approved the reclassification of 16.809 acres of land in Baltimore County, owned by the Trustees of the Sheppard and Enoch Pratt Hospital (Sheppard Pratt), one of the appellees, for residential apartment use with a special exception for elevator apartment buildings, subject to certain restrictions. The other appellee, Western Woods, Inc., is the contract purchaser of the reclassified land and joined with the owner, Sheppard Pratt, in filing the initial petition for the reclassification and special exception.

Sheppard Pratt originally owned 400 acres of land in Baltimore County. The 16.809 acre tract involved in this appeal (the subject property) was created by the involuntary severance of the subject property from the original 400 acre tract by the installation through the northern portion of the 400 acre tract of a major four-lane arterial highway, West Burke Avenue, connecting Charles Street on the west with York Road on the east. When the Comprehensive Land Use Map was adopted by Baltimore County on November 14, 1955, the proposed course for West Burke Avenue did not contemplate this severance of the subject property from the original 400 acre tract. A substantial portion of the subject property has pronounced grades; 32% of the land has grades ranging between 11% and 20%, and 23% of the land has grades ranging between 20% and 25%. There are also substantial rock deposits on the subject property.

At the time the Comprehensive Land Use Map was adopted in 1955, no zoning study was made of the large Sheppard Pratt tract, as Sheppard Pratt was using the tract for institutional and agricultural purposes and did not press for any particular zoning. Except for a strip, 150 feet deep, along Chesapeake Avenue, zoned in an R-10 zone (residence—one-family, lots not less than 10,000 square feet), the bulk of the Sheppard Pratt tract was zoned in a low density R-20 zone (residence—one-family, lots not less than 20,000 square feet). In 1955, only two acres of the subject property were sewerable and the then

available water facilities were inadequate for apartment development.

The subject property is roughly triangular in shape. The western boundary, forming the base of the triangle, is approximately 700 feet long. The northern boundary, forming a side of the triangle, is approximately 2315 feet long and the southern boundary, forming the other side of the triangle, is approximately 2385 feet long. The two sides of the triangle form an apex on the east, approximately 53 feet wide. The subject property is bounded on the west by old Charles Street, known now as Charles Street Avenue, and on the south by West Burke Avenue. A portion of the northern boundary is Chesapeake Avenue; the remainder of the northern boundary is formed by the rear yards of houses, in an R-6 zone, fronting on Dixie Drive. Bordering the subject property on the east is the land of the Towson State College.

Access to the subject property is proposed through an entrance on Charles Street Avenue and at two points on West Burke Avenue. No access is contemplated from Chesapeake Avenue and the order of the Board prohibited such access.

The road patterns surrounding the subject property have changed since November, 1955. West Burke Avenue was under construction when the case was heard by the Board in 1965. This east-west arterial street runs south of the Towson residential area and was designed to siphon off traffic using Charles Street Avenue and Chesapeake Avenue. West Burke Avenue is 48 feet wide from curb to curb and has a capacity of approximately 25,000 vehicles a day. Traffic experts estimated that it would initially carry approximately 8000 vehicles a day and a greater number ultimately. Osler Drive, intersecting West Burke Avenue from the south, gives access to St. Joseph's and Sheppard Pratt Hospitals and connects with Stevenson Lane, a four-lane road running between Charles Street and York Road and thence to the Loch Raven Boulevard area. Osler Drive was also under construction at the time of the hearing before the Board and Stevenson Lane had recently been completed. Charles Street Avenue, adjacent to the subject property, is a three-lane highway. Improved Charles Street, which intersects West Burke Avenue near the subject property, is a four-lane highway built

after November, 1955, and constitutes one of the better radial routes emanating northerly from Baltimore City to the Baltimore County Beltway. It also serves to feed traffic into the Towson commercial area by way of West Burke Avenue.

Directly south of the subject property, across West Burke Avenue, is 67 acres of a 100 acre tract of land acquired for the expansion of Towson State College. Farther south are three large hospitals. At the time of the hearing before the Board, two of these hospitals were nearing completion. One was the Greater Baltimore Medical Center, a 400 bed general hospital and large medical center with apartment units for the staff, constructed on 57 acres of land at an approximate cost of $12,-000,000. The other was St. Joseph's Hospital, an eight-story, 322 bed hospital with a school for 120 nurses, erected on a 27½ acre tract. Sheppard Pratt continues to operate its facility on approximately 100 acres of land. South of the Sheppard Pratt buildings is the property of the School Sisters of Notre Dame, used for institutional purposes, and the Rodgers Forge development of over 5000 group houses.

East of the subject property, bounding on West Burke Avenue, is the Towson State College. Nearby, on the east, is the property of Baltimore County, improved with a fountain-type arrangement to treat sewage and at the time of the hearing, used as a construction storage yard for cinders, salt, trucks, graders, pipe, tools, bulldozers and other County Public Works equipment. Still farther east are the Esso Office Building, the Blue Cross Office Building, Valley View and other apartments and finally, the commercial uses along York Road and the filling station at the corner of York Road and West Burke Avenue.

North of the subject property, between the Towson commercial area on the east and Bellona Avenue on the west, are primarily residential and institutional areas, most of the lot development being in either R-6 or R-10 zones. Southland Hills, an R-6 development running along Dixie Drive, abuts the subject property to the north. The land directly opposite the subject property on the north side of Chesapeake Avenue is zoned R-10, but is improved by only one house on a large hilltop site, between Charles Street and Woodbine Avenue, and six houses between Woodbine Avenue and Dixie Drive. Farther

north, but inside the Baltimore County Beltway, are the apartment developments along Charles Street.

West of the subject property is the block formed by Charles Street Avenue, West Burke Avenue, Charles Street and Boyce Avenue (the name given the extension of Chesapeake Avenue, west of Charles Street), which is improved with single-family residences developed in basic conformity with R-20 zoning.

The contract purchaser, Western Woods, Inc., proposed to build four six-story apartment buildings, 54 feet in height, each containing 85 apartment units, to house a total of 340 families on the 16.809 acre subject property. This is 12 families less than the maximum density allowable under the applicable zoning regulations. The proposed buildings would be so located that the building closest to Chesapeake Avenue would be across from the open land area of the house on the hilltop site and not in front of any home. The building located in front of, and across from the remaining homes on Chesapeake Avenue, would be placed the greatest distance away from that street. The roof of this building would rise only 12 feet higher than the roof of the building on 618 Chesapeake Avenue and is set back 79 feet from Chesapeake Avenue. The proposed buildings cover approximately 1.1 acres of land or 8% of the subject property, the remainder being available for open space and parking area. The buildings would be of brick and concrete construction. The apartments would be completely air-conditioned, with balconies, sliding glass doors, dish washers and disposals. There will be no building of any kind on the triangular parcel of land to the rear of the homes along Dixie Drive and this intention of the developer was a requirement of the Board in granting the special exception. It is proposed to maintain this area in its present natural wooded state.

The developer contemplates dividing the total of 340 apartment units equally between one and two bedroom apartments. There will be 442 parking spaces based on a formula of one parking space for each one bedroom apartment and 1.6 parking spaces for each two bedroom apartment. This exceeds the 346 parking space requirement of the applicable zoning regulations. The parking areas will be screened with decorative screen planting along the entire Chesapeake Avenue frontage.

Before the Board, the appellees produced several expert witnesses including an experienced developer, a market consultant and analyst, a real estate broker and appraiser, a land planner, and a civil engineer. These witnesses testified that after a study of the subject property and surrounding areas, in their opinion, the proposed construction would have no detrimental effect on the health, safety or general welfare of the locality, and gave reasons for their opinions. A well qualified traffic expert testified that, in his opinion, the proposed construction would create no traffic problem and gave detailed testimony supporting this opinion, which was not contradicted. The proposed apartment construction would present less fire hazard than garden apartments or even houses. There was adequate water pressure at the maximum height of the buildings to service fire fighting equipment. The site plan was in full compliance with the set back and height requirements of the applicable rules and regulations. The proposed construction would not interfere with the adequate light and air of the surrounding properties. There was also evidence indicating that the subject property could not be used for development under the existing zoning, as a practical, economic matter.

The protestants produced evidence tending to show that the subject property could reasonably be developed under its existing zoning and that the development of the subject property with the proposed apartments would be injurious to the neighboring properties.

In addition to the substantial changes in the road pattern since 1955, the appellees offered substantial evidence of other changes in the area surrounding the subject property since that date.

Except for approximately two acres of land, the subject property was not sewerable in 1955. In 1956 Baltimore County and Baltimore City adopted the "Register Wolff Report" which provided for the extension of public utilities into the Towson area, including most of the Sheppard Pratt area. This enabled Baltimore County to proceed with planning for greater density and resulted in the rezoning of many tracts of land in the north Towson area. In 1958 and 1959 the Sheppard Pratt property was served with a sanitary sewer line going down into Roland

Run and Jones Falls. This permitted a more intensive use of that land for apartment construction and eliminated the need for the treatment plant on the east edge of the property. In 1963 and 1964 a 16 inch water line was installed in Burke Avenue and a 12 inch water line in Charles Street. Adequate storm water facilities were installed after November, 1955, when West Burke Avenue was constructed.

Since 1955, there has been a substantial increase in the demand and need for apartment units. Mr. Gavrelis, Director of Planning for Baltimore County, testified that the office of Planning and Zoning had concluded that there was a need for apartments, and in the opinion of Mr. Gavrelis, available rental housing will not be enough to meet the demands arising merely from the increase in the longevity of the population. The substantially increased need for additional apartment units was also confirmed by the market analyst who testified for the appellees.

There has been, as we have indicated, a marked intensification of institutional uses in the area since 1955. Towson State College has doubled in size and its 1970 enrollment is projected at 10,000 students. The Greater Baltimore Medical Center ultimately will have 600 beds (400 were initially provided for the September, 1965, opening), and approximately 450 apartment units will be constructed for the hospital personnel. It was estimated that this hospital will have between 1000 to 1200 employees. St. Joseph's Hospital, already a substantial facility, has provision for expansion. The quiet, bucolic atmosphere of 1955 has changed to one of great activity resulting from the construction of the new large institutional facilities.

Also since 1955, a number of properties have been reclassified to permit apartment construction. Mr. Gavrelis estimated the number at several thousand.

The appellees also offered evidence tending to show that there was a mistake in the original zoning but we do not find it necessary to give the details of this testimony.

The Board, in a well-considered opinion, reviewed the facts, found, *inter alia,* that there had been a change in conditions in the area, that there would be no injury to the surrounding properties from the proposed reclassification and special exception, and by its order of March 6, 1965 granted both the reclassifi-

cation and special exception subject to four restrictions: (1) that the development be substantially in accordance with the site plan submitted by the developer; (2) that there be no vehicular access to Chesapeake Avenue; (3) that the buildings not exceed six stories on the Chesapeake Avenue side of the site; and (4) that the buildings should be situated on the property as shown on Exhibit No. 2 of the petitioners, and that no other buildings be erected on the subject property.

As we have indicated, Judge Menchine, on appeal to the Circuit Court for Baltimore County from the decision of the Board, affirmed the Board's decision, concluding that the issue was fairly debatable as there was sufficient evidence of either change or mistake to justify a reclassification and special exception and that the court should not, under our decisions, substitute its judgment for that of the Board.

We are of the opinion that the lower court correctly affirmed the decision of the Board and the order of the lower court will be affirmed.

We do not find it necessary to consider the questions raised by the appellees that there was an original mistake in zoning and that the appellants are not parties aggrieved and have no standing to maintain the appeal in this case, as we have concluded from the record that there was sufficient evidence of a change in conditions in the area in question to make the question of the proposed zoning reclassification and special exception fairly debatable. When the issue is fairly debatable we will not substitute our judgment for that of the Board, as we have held in many cases. See *Bosley v. Hospital for Consumptives of Maryland,* 246 Md. 197, 227 A. 2d 746 (1967) and the cases therein cited.

In our opinion, the significant change in the area in the road patterns, the intensification of the institutional uses, the substantial increase in water and sewerage facilities, the great increase in the need for additional apartment units and the zoning changes already mentioned are sufficient evidence of a change in condition in the area since November, 1955, when the comprehensive zoning map was adopted, to make the issues before the Board in this case fairly debatable. The facts were sufficient to sus-

712

tain the Board's conclusion that the reclassification was properly granted and that the special exception should be allowed.

*Order of May 27, 1966, affirmed, the appellants to pay the costs.*