TEMMINK ET AL. *v.* BOARD OF ZONING APPEALS OF BALTIMORE COUNTY ET AL.

[No. 70, October Term, 1956.]

*Decided January 11, 1957.*

The cause was argued before Brune, C. J., and Collins, Henderson, Hammond and Prescott, JJ.

*W. Lee Harrison,* with whom was *Richard C. Murray* on the brief, for appellants.

*John J. Brennan,* with whom were *Charles W. Held, Jr.,* and *John N. Maguire* on the brief, for appellees.

HAMMOND, J., delivered the opinion of the Court.

This is the second appeal by neighbors who object to the establishment of a shopping center near Catonsville from the action of the Circuit Court for Baltimore County in affirming the reclassification of the proposed site from residential to commercial. In 1952 the Board of Zoning Appeals reclassified to commercial three acres of a sixty-five acre tract on which the appellee, Colonial Gardens, Inc., was building houses, and the Circuit Court affirmed. We noted on the first appeal from that action, in *Temmink v. Board of Zoning Appeals*, 205 Md. 489, that there was no claim that there had been any mistake in the original zoning in 1945 but that it was urged that there had been a substantial change in the neighborhood. We noted also, that: "In the present case, however, there was a sharp conflict in the testimony before the Board of Zoning Appeals as to whether there has been such a substantial change in the neighborhood and such an urgent need for a shopping center as to justify reclassification. * * * There was also a conflict in the testimony as to whether the proposed shopping center would produce traffic jams and hazards on the streets in this area." The opinion pointed out what has been said so many times that only where there is no room for reasonable debate as to whether the facts justified the Board's action or where the record is devoid of supporting facts, may the court hold the action of the Board void. We reversed the case because the Board of Zoning Appeals relied heavily in reaching its decision on a report of the Planning Commission, which was not in evidence. We said: "* * * the question whether the action of a zoning board was arbitrary must be determined from the facts from which the conclusion was drawn, not from the conclusion itself. In reviewing the action of the zoning board, the court on appeal considers the board's action, not the opinion of its members. We will therefore reverse the order appealed from and remand the case for further hearing when the report of the Planning Commission may be introduced in evidence, and the parties may produce any further evidence and have the right of cross-examination".

The soundness of the reversal on the first appeal is shown

by the record in the appeal now before us. The report of the Planning Commission shows that it was written in 1952, that it found a need for the rezoning because "The proposed location is at the center of a neighborhood area that contains about 4000 people. * * * A neighborhood of this size should have a commercial center." It approved the proposed site for a shopping center because it would be "within walking distance of most of the homes in the service area" and "its patronage will come from the immediate neighborhood." It said that Edmondson Avenue "is the main or primary thoroughfare for this part of Catonsville. With removal of the car tracks (replaced by buses), it will become a dual lane boulevard. We propose to utilize the railway right-of-way as a roadbed, providing an extension of Edmondson Avenue to Ellicott City." As to traffic, it said: "The north-south street, called Lee Drive in this Colonial Gardens sub-division will become a secondary thoroughfare, similar to Rolling Road, from Old Frederick down to New Frederick, serving to reduce the traffic on the existing streets. The intersection of these two streets, Edmondson and Lee Drive, will be a focal point for traffic movement." It noted that there were a number of stores at the junction on Edmondson Avenue not far from the proposed site, as well as in Catonsville, one and a quarter miles from the site, and that two miles away, a new shopping center of some twelve acres was about to be built. It found that they could not conveniently or adequately serve the neighborhood needs, existing and prospective. The board, in its original, as well as in its supplemental, opinion handed down after the second hearing, said of the proposed location: "It is located at the intersection of two heavily travelled highways which not only makes it a desirable location for commercial purposes, but also results in the land becoming increasingly less attractive for residential purposes. We think this is a clear case of changed conditions * * *."

At the original hearing in 1952 it was said that some seventy-five houses were then under construction in Colonial Gardens and that about three hundred were planned. At the second hearing, in 1955, the testimony was that one hundred fifty-one had been built. The vice president of Colonial Gar-

dens, Inc., said that there were four hundred eleven houses presently occupied within a one mile radius of the proposed center and that he estimated, using three and two-tenths people per family as a minimum ratio, that some thirteen hundred fifteen people now live within the mile radius. Some two thousand acres would be within a circle with a radius of a mile and it was not shown how many of the thirteen hundred fifteen people living on those two thousand acres were living in the area at the time the property was zoned in 1945. It was stated that some four hundred houses were under construction and expected to be occupied within a year. On the same basis of estimation, this would mean that some twenty-seven hundred people would be living within a mile radius if all the homes were bought and occupied. The applicant plans to build a number of these homes itself. Whether its estimate will prove accurate may be doubtful, particularly since from 1949 to 1955, it built but a small fraction of the number it had planned to build and the growth in the area has fallen short of its predictions.

The director of the Planning Commission of Baltimore County testified in support of the Commission's report, which he introduced into evidence. The director said he did not intend to convey that there are now four thousand people in the area as the Commission report said there were and as the Board seemingly found, and that he didn't know how many there were. He said that the need for the center is to be considered as a long range need. He testified further: "I said I wouldn't attempt to say there is a need at this time" and that he didn't know and he didn't care whether there was or not because from the standpoint of planning, "* * * it doesn't make the slightest difference whether there are enough people to need it." His testimony further showed that the Planning Commission contemplated the future development of "hundreds and hundreds of acres" to the west of Rolling Road towards Ellicott City, and that the Commission's approval of the proposed site as a shopping center was in part for the reason that it would serve this indefinitely prospective development. It is difficult to reconcile this reasoning with a major premise of the report that customers

would walk to the center and that it would serve the "immediate neighborhood".

It was shown that there had been no commercial encroachment in the neighborhood—indeed three corners zoned commercial had never been put to use—since the original zoning in 1945 and that the three acres under consideration were entirely suitable for residential development. It was shown also that a quarter of a mile to the east is Edmondson Junction, in which there are a number of stores and that a little over a mile away in Catonsville there are many stores, and that, since the first hearing, there had been built but two miles away a twelve acre regional shopping center in which were stores of national chains and other stores, offering a great variety of goods and services.

If we assume without deciding that there was room for reasonable debate as to whether there had been shown a change in the character of the neighborhood and a need for the proposed shopping center, so that the Board's decision on those points was justified, we think there is nothing in the record as to roads and traffic in relation to the center that saves the Board's action from being arbitrary and unreasonable and much to show that it was.

There was evidence before the Board at the first hearing from protestants as to the inadequacy of the roads for existing traffic and the congestion and dangers of the roads in the neighborhood of the shopping center. In supporting its plan for a parking area for two hundred to three hundred cars adjacent to the center, the applicant's counter to this evidence was a general denial and the proposal for a service drive in the center that would enable traffic to leave and enter Edmondson Avenue at several points. The applicant did not at the first hearing, nor at the second, give any specific plans as to how traffic would leave and enter Edmondson Avenue, the only public street on which cars would come to and go from the parking area. It was shown that Edmondson Avenue is a twenty-two foot road heavily travelled, without sidewalks, and that it is dangerous for children and adults to walk along it. Adjacent to Edmondson Avenue is a Baltimore Transit Company right of way, a number of feet above the road and

entrances to and exits from the parking area would have to cross this right of way. The report of the Planning Commission foresaw that Edmondson Avenue, running east and west, would be a dual highway, and that Lee Drive, to be built by the applicant, running north and south, would be another heavily travelled highway. It was shown at the time of the second hearing that Lee Drive ended south of Edmondson Avenue just as it did at the time of the 1952 hearing. The Planning Director said it was to be carried through at some future time to a subdivision further to the south but he did not know where its northern terminal would be and where it would run, or how many streets it would cross. It would seem that it is paved to Old Frederick Road now and gravelled about six hundred feet north of Old Frederick Road. It has no curbs or gutters. The Board found, and based its action on the fact, that the center would be "* * * at the intersection of two heavily travelled highways". It is this road that the Board said was a heavily travelled highway. The other is Edmondson Avenue. The director of the Planning Commission was asked whether the report of the Commission did not contemplate that Edmondson Avenue would be a dual highway, and he said that this would be true as far as Rolling Road, but that west of Rolling Road, where the land of the applicant is located, Edmondson Avenue would continue to be a single highway. Asked when the dualization was to take place, he said there was no definite timing, that no funds had been appropriated and that it was still in the planning stage. The director testified flatly that access to the site was undesirable at the present time and that the widening of Edmondson Avenue, when it was done, would not be in front of the shopping center. He said further that the roads were not presently adequate and that he did not contemplate that the center would be built until the roads were adequate.

It is undisputed that despite the service drive or the use of Lee Drive, cars could only get into and leave the shopping center by way of Edmondson Avenue west of Rolling Road. In summary, the testimony was substantial and without plausible contradiction that Edmondson Avenue is already heavily

travelled and inadequate to care for the present volume of traffic, that it has no sidewalks, that to reach or leave the center it would be necessary to cross the right of way of the transit company adjoining Edmondson Avenue and several feet higher, that there were no plans as to how this could be or was to be done, that the plans for improving Edmondson Avenue east of Rolling Road are indefinite and that there are no plans or prospects for improving Edmondson Avenue west of Rolling Road where the shopping center traffic would use it most. In *Hardesty v. Board of Zoning Appeals of Baltimore County,* 211 Md. 172, we reversed the action of the lower court and the Board in rezoning land for a shopping center as arbitrary and unreasonable, where the two streets giving access to the site were narrow and without sidewalks, although the applicant had constructed a fifty foot road within the site. We said there: "This fifty foot road might accommodate the traffic from the shopping center until it reached Fifth Avenue. However, it is very evident that a sixteen foot street without sidewalks is not sufficient for access to a parking area for five hundred automobiles." We noted there that the shopping center would require truck traffic for the delivery of merchandise. In the case before us that would be true also. In the *Hardesty* case it was pointed out that both Code of Public Local Laws of Baltimore County, 1948, Title 23, Section 366 (a), and Code of Public Local Laws of Baltimore County, 1955, Title 30, Section 532 (a), as well as the general law, Code, 1951, Art. 66B, Sec. 21 (c), provide *inter alia* that zoning regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets, as had been noted for the Court by Judge Markell in *N. W. Merchants Term. v. O'Rourke,* 191 Md. 171, 192. We found in *Hardesty* that: "The Board in its opinion apparently ignored all the testimony as to the traffic hazards which would result from the erection of the shopping center on petitioner's land. To so reclassify the property would be a plain violation of the statutory requirement against congestion in the streets. From the testimony it appears that there is no way to remedy such a traffic hazard other than the widening of the public highways in the vicinity.

There is no testimony that such widening is contemplated. The order must therefore be reversed." We think the language last quoted and the findings in the *Hardesty* case are fully applicable to the facts of the case before us now, and control the decision here.

> *Order reversed; costs to be paid by appellants, pursuant to the direction of Code of Public Local Laws of Baltimore County, 1955, Title 30, Sec. 532 (h).*