CHAPMAN ET AL *v.* MONTGOMERY COUNTY
COUNCIL ET AL.

[No. 56, September Term, 1970.]

*Decided November 18, 1970.*

*Motion for rehearing filed December 16, 1970; denied
and opinion modified January 12, 1971.*

642

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and DIGGES, JJ.

*Joseph A. Lynott, Jr.,* for appellants.

*Warren Browning* for appellees Bernard S. Gewirz et. al., and H. *Christopher Malone, Assistant County Attorney,* with whom were *David L. Cahoon, County Attorney,* and *Alfred H. Carter, Deputy County Attorney,* on the brief, for appellee Montgomery County Council.

FINAN, J., delivered the opinion of the Court. BARNES, J., dissents. Dissenting opinion at page 650 *infra.*

This appeal is from an order of the Circuit Court for Montgomery County, Maryland, affirming the Resolution of the County Council of Montgomery County, Maryland, sitting as the District Council, rezoning 6.8 acres of land from R-R (Rural Residential) to C-1 (Local Commercial). The subject property is a part of a 15 acre triangular shaped, undeveloped and partially wooded tract. It is located in the Fourth and Tenth Election Districts, west of the proposed relocation of Falls Road between Liberty Lane and Victory Lane, immediately south of the proposed Outer Beltway and approximately 350 feet south of the Pepco transmission line. The subject property is completely surrounded by property zoned R-R. However, nearby there is R-90 zoning.[1] We are of the opinion that the record fails to reveal sufficient facts to render the issue of substantial change in the character of the neighborhood fairly debatable, and that the order of the lower court should be reversed.

In the hearing examiner's report, which obviously formed the basis for the action taken by the County Coun-

---

1. A Vicinity Map showing in detail the zoning for a much larger area extending over 3,000 feet from the subject property may be found with the Examiner's report filed with application No. E-914, Before The County Council For Montgomery County, Sitting as the District Council.

cil, much weight was attributed to the fact that the Master Plan for Potomac-Travilah and Vicinity, adopted by the Maryland-National Capital Park and Planning Commission on February 16, 1966, and approved by the District Council on January 25, 1967, recommends a commercial center for the subject property. This would have been a valid factor in determining whether the proposed rezoning should have been adopted, if other pertinent elements, such as the question of mistake in original zoning or a substantial change in the character of the neighborhood had been present. See *Town of Somerset v. County Council*, 229 Md. 42, 47 (with particular attention to note 2), 181 A. 2d 671 (1962). Cf. also, *Wells v. Pierpont,* 253 Md. 554, 557, 253 A. 2d 749 (1969); *Kirkman v. Montgomery County Council*, 251 Md. 273, 275, 247 A. 2d 255 (1968); *Helfrich v. Mongelli*, 248 Md. 498, 501-503, 237 A. 2d 454 (1968); *Shadynook Imp. Assn. v. Molloy*, 232 Md. 265, 269, 270, 192 A. 2d 502 (1963). However, absent the dynamics of mistake or change, are we not here once again confronted with the basic principle that the classification assigned the subject property in the comprehensive zoning plan, as distinguished from the Master Plan, must prevail? We think so.

A "Master Plan" is not to be confused as a substitute for a comprehensive zoning or rezoning map, nor may it be equated with it in legal significance. Nonetheless, a reading of the appellees' brief leads one to believe that they would have us do just that. In their brief they state: "[T]he Master Plan for Potomac-Travilah and Vicinity adopted * * * and approved by the District Council on January 25, 1967, is the presently existing comprehensive plan for the area." If, by this statement, the appellees are intending to convey the idea that the Master Plan for this area is also the existing zoning map, they are overreaching. The zoning as recommended or proposed in the Master Plan may well become incorporated in a comprehensive zoning map for this area, but this will not be so until it is officially adopted and designated as such by the District Council. The comprehensive zoning

map applicable to this area, as stated in the hearing examiner's recommendation, was adopted by the District Council May 31, 1958, is still in effect, and shows the subject property to be zoned R-R.[2]

A case which clearly illustrates the difference in the legal significance attached to a master plan as contrasted with comprehensive zoning is that of *Board of County Commissioners for Prince George's County v. Edmonds*, 240 Md. 680, 215 A. 2d 209 (1965). In that case, the gravamen of the decision in the lower court was that a master plan for an area, when approved and adopted, which recommended zoning different from that existing, gave rise to the presumption that there was either mistake in the original zoning or that a change in the character of the neighborhood had occurred. Judge Oppenheimer writing for this Court disagreed and stated:

> "Rezoning by comprehensive plan is a legislative function * * * and cannot be delegated except upon express authority * * *. Here, the Council is the legislative body in zoning matters designated by the General Assembly. * * *
>
> "The master plan * * * was adopted pursuant to Laws of Maryland, 1959, ch. 780 § 1, subsec. 63 as amended * * * The Act authorizes the Commission [The Maryland-National Capital Park and Planning Commission] to adopt a general plan for the district, after study and a public hearing * * *.
>
> "* * * [T]hat plan was only a guide for the Council for the long-range future; its adoption did not supplant, the Council's responsibility to make its own decisions. Nor did the master plan take the place of the comprehensive zoning

---

2. Counsel for appellees volunteered the information that the only area in Montgomery County in which a Master Plan has by ordinance become the comprehensive rezoning map is in the Cabin John Watershed Area.

previously adopted by the [District] Council."
240 Md. at 684-685.

The appellees, perhaps recognizing the weakness in their gratuitous assumption that they should prevail because of the designation of the subject property as a commercial location on the Master Plan, pressed more seriously the argument that there has been such a substantial change in the character of the neighborhood as to render that question "fairly debatable." [3] *Wells v. Pierpont, supra,* at 557, *Kirkman v. Montgomery County Council, supra,* at 276; *Helfrich v. Mongelli, supra,* at 505; and *Agneslane, Inc. v. Lucas,* 247 Md. 612, 620, 233 A. 2d 757 (1967).

Inasmuch as this Court is of the opinion that our decision in this case turns on the issue of whether or not the question of substantial change in the character of the neighborhood was fairly debatable, it is essential to an understanding of the conclusion which we reach that a review be made of the hearing examiner's analysis and finding on this point which we set forth in pertinent part:

"This record clearly establishes that since 1958, the date of the last comprehensive rezoning applicable to the subject property and its environs, there have been numerous reclassifications of land from the R-R zone to the R-150 and R-90 zones. Extensive development has resulted therefrom in recent years and continues at the present time. The rate of growth in this area has been enormous and the neighborhood is rapidly and consistently moving toward the achievement of its ultimate anticipated population. Public facilities such as schools, water service and sewer service, have already been provided, and an adequate road network is planned.

---

3. The appellees, and we think correctly so, raise no issue regarding mistake in original zoning. Cf. Bosley v. Hospital, 246 Md. 197, 201, 227 A.2d 746 (1967).

Other amenities such as churches and recreational facilities are in existence. While there are some recently completed shopping facilities within a radius of between 2 and 3 miles of the subject property, there are no shopping facilities within a radius of 1 mile of the subject property. * * *

"[T]here was also uncontradicted expert testimony presented to show that between 1960 and 1968 the Potomac Planning Area had the highest percentage of population growth of any area in the County; that the growth of the area herein involved, namely that area within a 1½ to 2 mile radius of the subject property has been many times faster than that occurring elsewhere in the Potomac-Travilah area; that at the present time there is an existing population adequate to sustain 115,000 square feet of commercial space; that rapid growth is continuing; and that projecting this rate of growth the area herein involved will reach its ultimate population in 3-5 years and will be able to sustain 150,000 square feet of commercial space. While there was evidence to show that there are several shopping facilities within a 2-3 mile radius of the subject property, some of which have been fairly recently expanded or developed, there was no evidence to show that there was any commercially zoned land available for development at any of these locations or any other locations in close proximity to the subject property. I am persuaded by the record that in terms of existing population and development there is a present and future need for commercially zoned land at the instant location. *On the basis of the evidence presented I find and conclude that there has been a substantial change in the character of the neighborhood from a relatively low-density single-family detached rural resi-*

*dential community to a medium-density single-family detached suburban community with a present and future need for a local convenience shopping facility.* I further find and conclude that this change in the character of the neighborhood is sufficient to justify reclassification in the instant case." [Emphasis supplied.]

The hearing examiner in her report demonstrated commendable expertise in assembling the facts and winnowing out of the 490 pages of testimony some very pithy conclusions. Her exploration of the need for such a facility in this area was supported by an impressive array of statistics on population growth. However, this is not a case in which the question of need evolves as a critical factor. Cf. *Wakefield v. Kraft,* 202 Md. 136, 146, 96 A. 2d 27 (1953) ; *Ellicott v. City of Baltimore,* 180 Md. 176, 184, 23 A. 2d 649 (1942). See also *Springloch Citizens' Group v. Montgomery County Board,* 252 Md. 717, 722, 251 A. 2d 357 (1969), and *Neuman v. City of Baltimore,* 251 Md. 92, 96, 246 A. 2d 583 (1968), wherein special exceptions were involved and under local ordinances need had to be demonstrated.

Unquestionably, much of the testimony in the transcript was devoted to the question of need because the appellees were fully aware that even if substantial change in the character of the neighborhood were established, this, of itself, would not necessarily compel rezoning but merely lay the foundation for it. *Furnace Branch Land Co. v. Bd. of Co. Comm.,* 232 Md. 536, 539, 194 A. 2d 640 (1963). On the other hand, change, buttressed by a need for the facility, might well have resulted in need being the persuasive factor. *Wakefield v. Kraft, supra.*

The record also contains a plethora of evidence regarding the impact which the rezoning may have on the generation, flow and density of traffic.[4] Again, this would be

---

4. See Temmink v. Board of Zoning Appeals, 212 Md. 6, 13, 128 A. 2d 256 (1957) for illustration where the impact of rezoning on the traffic pattern was a vital factor.

most vital to a review of the action taken by the District Council, if we were to pass beyond the key issue of change. However, as previously stated, we are convinced that our consideration must be confined to the rather narrow issue of the question of the debatability of a substantial change in the character of the neighborhood.

The main thrust of the examiner's report is that the substantial change in the character of the neighborhood consists of its transition from "a relatively low density single-family detached rural residential community to a medium-density single-family detached suburban community * * *." That is to say, over the years, there has been an intensification of the same use. It is true that in *Meginniss v. Sheppard-Pratt*, 246 Md. 704, 710, 229 A. 2d 417 (1967), we took cognizance of the fact that an intensification of institutional use in a low-density residential area, together with the advent of additional sewer facilities, constituted such a substantial change in the character of the neighborhood as would render reclassification for apartment use reasonably debatable. However, this Court has recognized in the past that there was a difference to be observed in the treatment of "reclassification from one residential sub-category to another," as distinguished from "the removal of the land from the use category in which it was placed when originally zoned * * *. In this respect, the situation is, to a certain degree, different from the application to reclassify property zoned as residential to commercial or industrial * * *." *Missouri Realty, Inc. v. Ramer*, 216 Md. 442, 449, 140 A. 2d 655 (1958). To the same effect see Judge Prescott's restatement of his dictum in *Ramer, supra,* in *Hyson v. Montgomery County*, 242 Md. 55, 76, 217 A. 2d 578 (1966). See also 26 Md. L. Rev. 48, at 51 (1966), wherein the author concludes, "Thus, the Court seems to adopt a more liberal attitude when reviewing amendments from one use to a similar use," citing *Ramer*.

It must also be noted that there has been no inroad of a business nature into the neighborhood in which the subject property lies so as to give it a "commercial flavor,"

to paraphrase *Kirkman, supra,* at 275.[5] Nor has there yet been any dramatic change wrought by highway construction in the neighborhood as was the case in *Beth Tfiloh Congregation v. Blum,* 242 Md. 84, 89, 218 A. 2d 29 (1966), and *Finney v. Halle,* 241 Md. 224, 237, 216 A. 2d 530 (1966).

We are left then with the question of the significance to be attributed to a substantial growth of population in the neighborhood. The answer to this is not elusive. This Court has repeatedly stated that an increase in population per se does not prove a substantial change in the character of the neighborhood. *Miller v. Abrahams,* 257 Md. 126, 262 A. 2d 524 (1970); *Wells v. Pierpont, supra,* at 559; *County Commissioners v. Fairwinds,* 230 Md. 569, 572, 187 A. 2d 845 (1963); *Didlake v. Poteet,* 228 Md. 588, 591, 180 A. 2d 828 (1962). Also cf. *Goucher College v. DeWolfe,* 251 Md. 638, 641, 248 A. 2d 379 (1968); *Board of County Commissioners v. Kines,* 239 Md. 119, 123, 210 A. 2d 367 (1965).

Since the rationale of this opinion is predicated on the need of the appellees to establish that the question of substantial change in the character of the neighborhood was reasonably debatable, and we hold that the record fails to support this, it becomes unnecessary for us to consider what may eventually be the impact on this area of the location of the Outer Beltway, the relocation of Falls Road, or the question of whether the qualifications attendant to the granting of the proposed rezoning by the District Council amounted to conditional zoning. With regard to the question of the proposed highway improvements, these may well have been pertinent to the issue of change were they "reasonably probable of fruition in the foreseeable future." *Jobar Corp. v. Rodgers Forge,* 236 Md. 106, 112, 202 A. 2d 612 (1964); *Rohde v. County Board,* 234 Md. 259, 264, 199 A. 2d 216 (1964); *Trustees of McDonogh, etc. v. Baltimore County,* 221 Md. 550, 570-71, 158 A. 2d 637 (1960). However, the record discloses that

---

5. See also Town of Somerset v. County Council, 229 Md. 42, 48, 49, 181 A. 2d 671 (1962).

the improvements to Falls Road, which the examiner readily agrees should be made, were not included in any currently funded state highway construction program and according to her findings "a definite determination as to the location of the proposed Outer Circumferential Beltway will not be made for at least two years."

Were we to do other than reverse the order of the court below, we would be abetting an impermissible type of "spot zoning" or piecemeal zoning looked upon with disfavor by our predecessors many years ago in *Cassel v. City of Baltimore*, 195 Md. 348, 357, 73 A. 2d 486 (1950) ; 26 Md. L. Rev. 48, at 56-57 (1966).

> *Order reversed, appellees to pay costs.*

BARNES, J., dissenting:

I dissent because, in my opinion, there was sufficient evidence before the District Council to make "fairly debatable" its finding that there had been sufficient change in conditions in the neighborhood to justify the rezoning of the subject property from the R-R (Rural Residential) zone to the C-1 (Local Commercial) zone.

The excellent original Report and Recommendation of Mrs. Rita C. Davidson, the hearing examiner in this case, dated November 26, 1968, consisting of some 23 printed pages in the Record Extract with 19 informative notes and the hearing examiner's Further Report and Recommendation dated August 5, 1969, consisting of 93 printed pages in the Record Extract, with 104 comprehensive and helpful notes, are perhaps the clearest and most comprehensive. analyses of all relevant zoning factors in regard to a subject property I have yet seen. The majority has quoted a portion of the findings of the hearing examiner from the original report in regard to the changes which were offered to show substantial change in the character of the neighborhood. There have been omissions from the quoted material which, in my opinion, are also relevant.

The hearing examiner also stated:

"The opposition concedes that there has been considerable growth and development in this area, all in accordance with the adopted and approved Master Plan."

After summarizing the uncontradicted evidence which is quoted in the majority opinion, the hearing examiner found:

"I am persuaded by the record that in terms of existing population and development there is a present and future need for commercially zoned land at the instant location."

The hearing examiner made another significant finding when she stated:

"This record establishes that in recent years there has been a considerable amount of zoning change and development pursuant thereto in the general area. Indeed, changes in zoning and development have been sufficient to justify the provision of public services such as sewer and water, both of which are presently available. The record does not show that there is, at the present time, a severe traffic problem on Falls Road. Rather it shows that at present this road is operating at approximately 25 to 30% of its designed capacity."

The District Council remanded the application to the hearing examiner for taking of testimony in regard to the nature of Falls Road, the projected plans for its improvements and the effect this proposed change would have upon it. After taking additional testimony and hearing oral arguments, the hearing examiner submitted her Further Report and Recommendations already mentioned. In her recommendations to the District Council, the hearing examiner stated:

"This record establishes that the instant application was filed in May, 1966. It is now Au-

gust, 1969. For three years the applicants have been seeking to obtain approval of a reclassification which would provide a facility which in both Mr. Hussmann's [Director of the Office of Program Coordination] and the Hearing Examiner's view, is now urgently needed to relieve the continuously mounting pressures at the Potomac Center and thereby to avoid the ultimate destruction of the Potomac Master Plan. Much time, effort and money has already been spent by all parties, as well as the government, in an attempt to arrive at a just and equitable decision which will preserve the public interest. At this point in time both public policy and equity demand that a decision be reached in as direct and speedy a fashion as possible."

It is clear from the record that both the Technical Staff and the Planning Commission approved the proposed rezoning and recommended it to the District Council, giving their reasons for their recommendations.

The District Council, in its opinion and resolution of September 9, 1969, consisting of eight printed pages in the record, stated in part:

"Specifically, the Hearing Examiner found that there has been a change in the character of the neighborhood sufficient to justify the requested reclassification; that there is a present and future need for additional commercially zoned land at the instant location; that the requested reclassification is in accord and harmony with the comprehensive zoning plan for the area; and that the grant of the requested reclassification prior to the widening and improvement of Falls Road and prior to a definitive determination as to the location of the Proposed Outer Beltway and its interchange will not have an adverse effect on surrounding properties and the general area and is not premature.

"The District Council agrees with the findings, conclusions and recommendations of the Hearing Examiner. The subject property is located in a general area which, as of this date, has already experienced extensive residential development and growth. The neighborhood is rapidly and consistently moving toward the achievement of its ultimate anticipated population. Facilities such as schools, water service and sewer service have already been provided, and an adequate road network is planned. Other amenities, such as churches and recreational facilities, are in existence. The area within which the subject property is located can no longer be described as one of a single-family, rural residential character, but rather must be described as one of a medium density, suburban community. There is no question but that there has been a change in the character of the neighborhood sufficient to justify reclassification in the instant case."

\* \* \*

"[T]he record shows that the area herein involved will continue its present rapid rate of growth, and that there will be, by 1971, a time prior to the completion of the proposed facility, a population sufficient to support a shopping center of a minimum of 110,000 square feet. Existing facilities are inadequate to support this burgeoning population. There are no planned commercial facilities other than the one herein involved, which will be capable of servicing the residents of the trade area herein involved. Moreover, unless additional commercial zoning is provided at the instant location at the present time to relieve the Potomac Center of continuously mounting pressures for expansion, the Master Plan for the area will be disrupted and destroyed. We are firmly convinced by the rec-

ord before us that there is a present need for a local convenience shopping facility of at least 110,000 square feet at the instant location at the present time, and that the grant of the requested reclassification, particularly if exercised in such manner as would offer reasonable assurance that the proposed center were confined to 110,-000 square feet of gross retail floor area, is not, in this respect, premature."

This Court in *Bosley v. Hospital for Consumptives of Maryland,* 246 Md. 197, 227 A. 2d 746 (1967) held that substantial growth in the population in the neighborhood with resulting changes in the zoning from single-family residential use to apartment use, together with improvement in roads and substantial improvements in the water and sewerage facilities since the adoption of the comprehensive zoning map were sufficient to justify the rezoning of the property in that case from a single-family residential zone to a commercial zone so that the needs of the growing population could be met. The County Board of Appeals of Baltimore County had approved the proposed commercial rezoning; and its action was affirmed on appeal by the Circuit Court for Baltimore County and thereafter, on further appeal, was affirmed by us. It is interesting to observe that in *Bosley,* the principal witness for the protestants was the Director of Planning for Baltimore County who specifically made the point that because the rezoning changes in the neighborhood were only to more intensive residential use, commercial zoning was not appropriate or justified. We stated:

"[T]he rezoning changes subsequent to November 1955 [when the last comprehensive zoning map was adopted], previously discussed, were important changes in the law and resulted in substantial changes in the character of the neighborhood even though all of the rezoning changes were to more intensive residential use

by an increase in density from R-6 or R-10 to R-A. The substantial development of housing units and the concurrent growth in population could reasonably lead to need for additional commercial zoning in the area to supply the wants of the increased population. At least, reasonable men could conclude—as the Board concluded—that these changes in condition in the area could justify the rezoning of the subject property to the B-L zone. The Courts may not substitute their judgment for that of the Board when the Board's decision is supported by substantial evidence and the issue before the Board was fairly debatable. *Vogel v. McCosh,* 242 Md. 371, 219 A. 2d 89 (1966). See *Finney v. Halle,* 241 Md. 224, 216 A. 2d 530 (1966) ; *Oursler v. Board of Zoning Appeals of Baltimore County,* 204 Md. 397, 104 A. 2d 568 (1954). See also *Rohde v. County Board of Appeals for Baltimore County, supra."*

(246 Md. at 204, 227 A. 2d at 750.)

*Bosley* has not been overruled by this Court and, in my opinion, should be dispositive of the present case. Indeed, *Bosley* is mentioned in *Wells v. Pierpont,* 253 Md. 554, 253 A. 2d 749 (1969) ; but it was not suggested that our decision in *Bosley* was impaired or overruled, although as I pointed out in my dissent in *Wells,* I was of the opinion that our decision in *Bosley* could well have been applied in *Wells,* even though there were some differences in the facts between the two cases. It may be observed that the instant case is distinguishable from *Wells* in that in the present case there is a more intensive growth of population, sufficient to justify the installation of public services such as sewer and water, and most importantly, the promulgation and adoption of a Master Plan including the subject property as a commercial zone for shopping center purposes, subsequent to the last comprehensive zoning. Moreover, in the instant case *all* of the zon-

ing authorities recommended the rezoning as contrasted with the opposition of the Director of Planning in the *Wells* case.

The majority correctly observes that a Master Plan is not to be a substitute for a comprehensive zoning plan. On the other hand, a Master Plan duly promulgated and officially adopted, indicates the best professional official zoning expertise in the jurisdiction affected by the Master Plan in regard to the public needs, the proper zoning to supply those needs and the type of zoning development which should occur within the jurisdiction. The formulation and adoption of a comprehensive zoning map is an expensive, difficult and time-consuming endeavor. It is not practicable to adopt a comprehensive zoning map or plan within short intervals. The growth of population in a given area, however, continues without regard to when a comprehensive zoning map may be adopted in the future. The zoning needs of the increased number of citizens *must be met currently* and not at some time in the indefinite future. The promulgation and adoption of a Master Plan is a reasonable and proper zoning device to guide the legislative body in the orderly and desirable meeting of those public needs.

When the density of population in a neighborhood substantially increases and rezoning has been allowed to supply the housing needs for that substantially increased population, it is apparent to me that commercial facilities for supplying food, clothing and other necessities of life become necessary for that increased population and that appropriate rezoning should be allowed to satisfy those new and pressing needs prior to the next comprehensive rezoning. In the highly volatile situation in Montgomery County this is particularly desirable and in the public interest. Unfortunately, as the present case so clearly indicates, this public need for orderly interim zoning changes is frustrated by the "mistake in original zoning—change in conditions changing the character of the neighborhood" rule as narrowly applied by this Court. In several dissenting and concurring opinions, I have

sought to point out the defects in the present rule and its application. See, *e.g., MacDonald v. Board of County Commissioners for Prince George's County,* 238 Md. 549, 576-601, 210 A. 2d 325, 340-354 (1965) ; *Minor v. Shifflett,* 252 Md. 158, 168, 249 A. 2d 159, 165 (1969) ; *Brown v. Wimpress,* 250 Md. 200, 210, 242 A. 2d 157, 163 (1968) ; *Randolph Hills, Inc. v. Whitley,* 249 Md. 78, 90, 238 A. 2d 257, 264 (1968) ; *Wahler v. Montgomery County Council,* 249 Md. 62, 71, 238 A. 2d 266, 271 (1968) ; *Mack v. Crandell,* 244 Md. 193, 200, 223 A. 2d 248, 251 (1966) ; *Woodlawn Area Citizens Association, Inc. v. Board of County Commissioners for Prince George's County,* 241 Md. 187, 201, 216 A. 2d 149, 158 (1966) ; *Pallace v. The Inter City Land Co.,* 239 Md. 549, 559, 212 A. 2d 262, 267 (1965) ; and *Miller v. Abrahams,* 239 Md. 263, 275, 211 A. 2d 309, 316 (1965).

Perhaps the most serious objection to the "mistake-change" rule is in the confinement of "changes in conditions in the character of the neighborhood" to physical changes which result in the change in the neighborhood's character. There may well be changes in planning and zoning concepts by the planning and zoning experts, provisions for reasonably anticipated population shifts, development, relief of traffic congestion and the like which should be included in the concept of "change in conditions" which result—or should result—in a change in the character of the neighborhood for the purposes of the rule. As I have observed before, the test, itself, in my opinion, is not the correct one but should be instead, "Is the action of the legislative body in granting the rezoning arbitrary, unreasonable, capricious or discriminatory and thus a denial of due process of law ?" A mistake in original zoning and physical changes in the neighborhood which change its character are relevant factors to be considered in reaching this ultimate determination, but these two factors by no means should be thought to be *exclusive factors*. It is at this point that the majority of the Court and I differ and the present case serves as an excellent illustration of that difference.

Although as the majority correctly points out, a mere increase in density does not, per se, result in a "change in conditions in the character of the neighborhood," it is a most important factor to be considered. When the truly extraordinary increase in density and the rezoning for more intensive residential uses, which have already occurred in the neighborhood in the present case, are considered, with the recommendations of the Technical Staff, the Planning Commission, the inclusion of the subject property as a commercial area for a shopping center in the Master Plan, the approval of the District Council, affirmed by the lower court, together with the testimony supporting these recommendations and conclusions, it cannot be reasonably said, in my opinion, that the action of the District Council in the instant case was arbitrary, unreasonable, capricious or discriminatory. On the contrary, it was in the public interest and, as I see it, should be supported by the Courts. In short, the action was "fairly debatable"; and we are in error, in my opinion, to fragment the correct constitutional rule and by a narrow construction of that fragmentation, frustrate the legislative action.

One fundamental defect in the "mistake-change" rule is that the damage to the neighborhood by blight or otherwise must occur before the zoning authorities and legislative bodies can attempt to meet the problems by rezoning. At that time, however, the choices open are quite limited. Usually the only practicable choice is to acquiesce as gracefully as possible in the damaged conditions and permit uses which complete the destruction of the former character of the neighborhood. It is a classic example, to my mind, of locking the barn door after the horse has been stolen. This Court would be well advised to permit the zoning authorities and legislative bodies to lock the barn door first.

The majority states that if the Court failed to reverse the Circuit Court in the present case, it "would be abetting an impermissible type of 'spot zoning' or piecemeal zoning looked upon with disfavor by our predecessors

many years ago in *Cassel v. City of Baltimore,* 195 Md. 348, 357, 73 A. 2d 486 (1950) ; . . . ." With respect, I suggest that this begs the question by assuming that the proposed piecemeal zoning is "impermissible." In *Cassel,* the Court, properly, in my opinion, condemned an attempt to make a single small lot in Baltimore a first commercial use district to enable the owner to operate a funeral home; but Judge Delaplaine, for the Court, was careful to point out that there were permissible "spot zones" as well as "impermissible" ones. He stated:

> "On the other hand, it has been decided that a use permitted in a small area, which is not inconsistent with the use to which the larger surrounding area is restricted, although it may be different from that use, is not 'spot zoning' when it does not conflict with the comprehensive plan but is in harmony with an orderly growth of a new use for property in the locality. The courts have accordingly upheld the creation of small districts within a residential district for use of grocery stores, drug stores and barber shops, and even gasoline filling stations, for the accommodation and convenience of the residents of the residential district. *Higbee v. Chicago, B. & Q. R. Co.,* 235 Wis. 91, 292 N. W. 320, 128 A.L.R. 734; *Marshall v. Salt Lake City,* 105 Utah 111, 141 P. 2d 704, 149 A.L.R. 282."
> (195 Md. at 355, 356, 73 A. 2d at 489.)

See also *Hewitt v. County Commissioners of Baltimore County,* 220 Md. 48 at 57, 58, 151 A. 2d 144, 149-50 (1959).

I am not impressed with the notion that this Court should rule differently if the rezoning is for a more intensified residential use than if the rezoning is for a commercial use needed and useful to the increased population. A shopping center, supplying food, clothing and other necessities of life, is a necessary requirement of community life, and should reasonably be provided for

by the zoning authorities. I can see no essential difference between providing food and clothing, on the one hand, and shelter on the other. They are both necessary to life and the same basic considerations of policy underlying the supplying of zoning to satisfy those needs are as present in the one case as in the other. We ruled to this effect in *Bosley, supra.*

Even under the present "change in conditions changing the character of the neighborhood" rule as construed and applied by this Court, there was, in my opinion, sufficient evidence in the record to make that issue "fairly debatable," as already set forth. If the correct rule were to be applied, there could be little question, as I see it, that the District Council's action was not arbitrary, unreasonable, capricious or discriminatory, and should be affirmed by the courts.

One unfortunate result of the failure of the Court of Appeals to embrace the correct rule is the multiplication of zoning appeals to this Court. As I see it, so long as the "mistake in original zoning—change in conditions changing the character of the neighborhood" rule is followed by this Court, there are bound to be more decisions on the facts of a particular case with seemingly conflicting opinions by the Court and a general belief by the Bar and by potential litigants that every one has at least a chance for victory in this Court. It is my opinion that much of this difficulty would disappear if this Court were to adopt the correct rule to which most of our sister states adhere. It is a "consummation devoutly to be wished."

I would affirm.